269 N.J. Super. 172 (1993)
634 A.2d 1361
IN THE MATTER OF THE GUARDIANSHIP OF J.T.
Superior Court of New Jersey, Appellate Division.
Argued September 13, 1993.
Decided September 17, 1993.
Reargued November 15, 1993.
Decided November 22, 1993.
*175 Before Judges J.H. COLEMAN and MUIR, Jr.
Helen E. Cooney argued the cause for appellant-intervenor (Ronald A. Breslow, attorney; Ms. Cooney, on the brief).
Karen Kleppe Lembo, Deputy Attorney General, argued the cause for respondent DYFS (Fred DeVesa, Acting Attorney General of New Jersey, attorney; Andrea M. Silkowitz, Assistant Attorney General, of counsel; Ms. Lembo, on the brief).
Nicholas A. Galante argued on behalf of natural mother (Galante & Matthews, attorneys; Mr. Galante, on the brief).
Bryant F. Connelly, Law Guardian, did not appear but submitted a letter supporting the decision below.
PER CURIAM.
This is a continuation of the foster mother's appeal following our remand decision of September 17, 1993. In our prior decision, we did not articulate the extensive procedural history which spans nearly four years. Since we conclude that the order dated October 14, 1993, transferring J.T. to her natural mother must be reversed, it becomes necessary to outline the detailed procedural history and factual statement.

*176 I. PROCEDURAL HISTORY and FACTUAL STATEMENT

J.T. was born on November 20, 1989, and she has been in the same foster home since January 4, 1990. The biological mother of J.T. has two other daughters who were one and two years old in 1989. Prior to the birth of J.T., the Division of Youth and Family Services (DYFS) became involved with the family during the summer of 1989 after receipt of complaints that the girls were being neglected and that domestic violence was occurring in the home. The two girls were taken to live with their maternal grandmother in Puerto Rico on July 19, 1989.
J.T. was born at St. Joseph's Hospital in Paterson. The hospital contacted DYFS because the infant was born premature and the mother was addicted to cocaine, had no prenatal care and both the mother and infant had syphilis. The hospital also needed consent to transfer the infant to another hospital. The mother had used cocaine just two hours before she was admitted to the hospital in labor. The mother was discharged from the hospital on November 25, 1989, but the premature infant remained. DYFS met with the mother on December 13, 1989, and the DYFS caseworker informed the mother and father of J.T. that DYFS would seek custody of J.T. because DYFS had been unable to contact them since the mother was discharged from the hospital.
On December 18, 1989, DYFS filed a Verified Complaint for Protective Services. The complaint alleged that the natural father of J.T. was crazy and the couple had no place to live. The maternal grandmother had informed DYFS caseworkers that she was unable to care for J.T. On February 1, 1990, DYFS was granted an order for protective services. In the interim, J.T. was discharged from the hospital and placed with the present foster mother on January 4, 1990. The February 1, 1990, order provided that visitation between J.T. and her mother and father "take place a minimum of two times a month." By orders dated April 20, 1990, and July 5, 1990, J.T. continued to be in the protective service of DYFS.
*177 After the mother and father failed to express an interest in J.T. for more than a year, to arrange a permanent plan for J.T., a complaint for termination of parental rights was filed by DYFS on March 12, 1991. However, before the complaint was filed, the mother called the DYFS Adoption Resource Center on February 26, 1991, requesting that J.T. be surrendered to her. She offered no explanation for her absence and failure to express any interest in the child for approximately fourteen months. In response to the complaint and order to show cause, the biological mother appeared in court after she was assigned an attorney to represent her interest. Default was entered as to the natural father on May 21, 1991.
The biological mother appeared in court on April 17, 1991, to express her opposition to termination of her parental rights. The parental rights of the natural father, however, were terminated that day. The biological mother met with DYFS workers on June 18, 1991, and requested that J.T. be placed with her maternal grandmother. Since the grandmother had already declined to accept custody, the mother was informed the matter had to be resolved by the court. That was an erroneous decision by DYFS which we will discuss later.
Trial on the complaint for termination was scheduled for August 7, 1991, but was adjourned to August 20, 1991, and again adjourned to October 30, 1991. During the trial, DYFS presented testimony by Dr. Frank Dyer, a psychologist, who testified that J.T. had bonded with the foster mother. He also testified that removal of J.T. from the foster mother would cause the child to suffer "devastating separation trauma." Dr. Dyer's opinions were based on an evaluation of J.T. on July 31, 1991, after the child had been with the foster mother for approximately twenty months. He opined that the long-term consequences would be severe impairment in the child's self esteem, basic trust and capacity to form intimate emotional connections with others. He also stated the child would be vulnerable to depression and personality disorders later in life.
*178 Irene Cusack, a Family Service Specialist Three Case Worker who was employed by DYFS from 1988 to 1991 in the Paterson Office, also testified for DYFS. She is fluent in Spanish and was the case worker assigned to the case between June 1989 and September 1990.
Ms. Cusack testified that she contacted the maternal grandmother and the father's sister to take J.T., but they were unable to do so. Consequently, when J.T. was discharged from the hospital on January 4, 1990, she was placed in the present foster home by Ms. Cusack. Thereafter, Ms. Cusack contacted G.A., a relative of the mother, on February 14, 1990, to ask if she would take care of J.T., but she said no. The Child Placement Review Board conducted its first review on April 3, 1990; there was no attendance by J.T.'s parents. The Board continued the placement and accepted the placement plan. In June 1990, the father's brother informed DYFS that there were family members willing to care for J.T. The relatives were two of the same people who had already declined to take care of J.T. Ms. Cusack also had contact with the mother on June 8, and July 11, 1990, but no interest was expressed in J.T.
Tania Rodriguez, another DYFS case worker, also testified. Ms. Rodriguez became responsible for the case on October 3, 1990. She testified that J.T.'s parents were located on December 7, 1990, through a police report involving a criminal charge that the father had threatened to kill J.T.'s mother. Ms. Rodriguez wrote a letter in Spanish to the parents of J.T. asking them to contact her because DYFS was preparing to seek a court order terminating their parental rights. Ms. Rodriguez met with the mother on February 26, 1991, who stated she wanted her daughter back. She explained to the mother that a complaint to terminate parental rights was about to be filed and that she would have to await the outcome of the court proceedings. This was the first time the mother had expressed any interest in the child. She next saw the mother on March 25, 1991, which was after the complaint had been filed and a court hearing had been set for April 17, 1991, as the *179 return date on the Order to Show Cause. Ms. Rodriguez continued to have contact with the mother for the remaining time before the trial was concluded.
At the conclusion of the evidence on October 31, 1991, the trial judge stated he was not satisfied that DYFS had established by clear and convincing evidence that other reasonable alternatives to termination of the mother's parental rights had been considered by DYFS. He directed the attorneys to research whether DYFS was required to consider other alternatives discussed in New Jersey Div. of Youth and Family Serv. v. A.W., 103 N.J. 591, 608-12, 512 A.2d 438 (1986). The judge stated that if DYFS was required to consider other alternatives, then "I may want to look into the alternative, come back in three or four months with the alternatives and balance them."
On December 18, 1991, the judge considered written summations and the evidence respecting the A.W. issue, and concluded that DYFS was obligated to consider other alternatives to termination and that DYFS had not investigated other alternatives to termination satisfactorily, one of which had been suggested by the natural mother when she spoke with a DYFS caseworker on February 26, 1991, and again when she testified on October 31, 1991. An order was entered on January 2, 1992, directing DYFS to (1) investigate other alternatives, and (2) arrange for the biological mother to visit with J.T. at a DYFS office twice a month. The matter was rescheduled for February 5, 1992.
As a result of the February 5, 1992, review, the court found that a report from DYFS was not extensive enough. In an ensuing order dated March 11, 1992, the judge directed DYFS to "conduct an in-depth study regarding the [natural mother's] proposed alternatives to termination of her parental rights." The proposed alternative involved the mother's request to take custody of the child. By that time the mother was living with a new boyfriend whom she later married. The matter was adjourned without date and the "Clerk of the court shall be notified as to when the above referenced report is completed and/or when the decision [by the *180 New Jersey Supreme Court] In the Matter of K.L.F., [129 N.J. 32, 608 A.2d 1327 (1992)] is released for publication...." K.L.F. was decided on June 30, 1992, and the trial court rescheduled the matter for August 20, 1992.
On August 20, 1992, the foster mother was permitted limited intervention, and on September 25, 1992, the judge appointed Dr. Rotman to conduct an immediate evaluation of all the parties' as contemplated by K.L.F. respecting "the bonding and relationship between [J.T.] and her biological mother as well as the bonding and relationship with her foster mother...." The matter was rescheduled for October 30, 1992, and DYFS was directed to submit its report to the court on uniting the child with the natural mother in light of K.L.F. The order was signed on September 25, 1992.
Dr. Betram Rotman, a clinical psychologist, was the only witness to testify on October 30, 1992, a full year after the trial commenced on the termination complaint. He testified that after evaluating the interested parties in October 1991, it was his opinion that J.T.'s interest would be best served if she were placed with her natural mother, provided that the natural mother furnish an appropriate and proper upbringing for her. The judge signed an order on December 4, 1992, dismissing without prejudice the complaint for termination. The order directed DYFS to (1) immediately seek custody of J.T. under Title 9, (2) undertake a plan for gradual unification, (3) arrange therapy/counselling for J.T., the biological mother and her new husband, and (4) arrange visitations between J.T., the biological mother, her two other children and her husband. The judge denied the foster mother's application for a stay.
The foster mother filed this appeal on December 4, 1992. We denied her emergent motion for a stay pending appeal on December 15, 1992. The trial court entered several orders during 1993 changing the visitation schedule and establishing new dates for the transfer of J.T. to the biological mother. The transfer dates were modified because the visitations indicated that little, if any, progress *181 toward unification was being achieved. The lack of progress prompted our remand decision.

II. REMAND EVIDENCE

On remand, Dr. Rotman testified as a court appointed expert. He testified that after his August 20 report mentioned in our remand decision, he supervised four visits between J.T. and the biological mother as of September 23, 1993. He stated that after the visit on September 14, J.T. was taken to the home of the biological mother and would not go in. The same thing occurred on September 15. Another visit was scheduled for September 22. J.T. and the foster mother showed up, but the biological mother called and canceled the visit.
When asked to describe the quality of the relationship between J.T. and the foster mother, he stated "I sense that there is a bonding, a closeness between [J.T.] and [the foster mother], and I felt that the longer the situation has gone on, the bonding obviously has gotten closer and tighter.... I feel that they are very close. I feel that [J.T.] is probably becoming more and more aware that something is going on in her life."
As to the quality of the relationship between J.T. and her biological mother, Dr. Rotman stated:
As far as the quality, again, when given the opportunity, I find that [the biological mother] and [J.T.] do relate, do relate well. It's in a play atmosphere again or crackers are handed back and forth in my office or whatever, and there are times when [J.T.] does respond to [the mother]. Again, sometimes I feel the vehicle has been the children [of the mother], all right, through the play, and that's when [the mother] does get involved with [J.T.]. But she doesn't seem to truly be fearful of [the mother]. There are times, though, she will stay with [the foster mother] as opposed to going over to [the biological mother].
He described that relationship further by stating he "feel[s] there is a recognition. I feel that [J.T.] does at times feel comfortable. She allows [the biological mother] to hold her, not for extended periods of time, and again will return to [the foster mother]." He said he cannot predict the extent or quality the relationship may develop into.
*182 After he met with J.T. and the biological mother on October 4, 1993, his opinion was unchanged on that issue. He testified that the "quality of the relationship, when given the opportunity, when the circumstances are right for it, the quality is a very positive one. Again, it's limited to what I consider maybe a very sterile atmosphere, and the sterile atmosphere is my office. That has an influence, too."
Dr. Rotman expressed the following opinion on September 23 concerning the effect of a transfer of J.T.:
I think that at the point of transfer it would be very, very traumatic. It would be difficult. I think I also stated that, if I remember correctly, back in October when I first got involved on the original report, in my testimony that this was going to be a difficult, difficult transfer. I do feel, I did feel back then, that these transfers do take place, they can work out if everybody works on it and works towards the same goal. That is what I stated back in October.
It's going to be difficult. It's going to be very, very rough for this child. It's going to be rough for [the foster mother]. It's going to be a tremendous adjustment for [the mother]. But in all honesty, and they're sitting here, I'm concerned about [J.T.]. It's going to be very difficult. The support systems are really going to have to work very hard to help at this point now. Harder than they would have maybe a year or two ago, whatever. But they're going to have to work very hard to help this child through this transfer.
Despite the fact that our remand decision directed Dr. Rotman to focus on the impact a transfer would have upon J.T., he testified that he viewed his role differently: "My role has been to try to work through the reunification and deal with everybody involved, but have not really focused on seeing [J.T.] individually. I know other people have ..., and I have no problem with that...." For that reason we granted additional time to allow Dr. Rotman to focus on J.T.
After he met with J.T. on September 27, 28 and 29, 1993, he expressed the following opinion on whether unification should occur:
I feel that at ... almost age four, ... I think there is a question now as to what a separation will do to this girl. Again, I feel strongly that there has to be encouragement and support, and I'm not sure it was there.... At this point in a child's life the maternal parent is a very important person for that child. As you reach four, five, that stability of that one person is important, and they look to that person for guidance. And if the direction and guidance from that person isn't in *183 the same direction as the Court has been working for, it's going to be  I feel would end up possibly being harmful to her down the road, yes.
He testified that his use of the term "difficulty" meant "traumatic" even though he could not quantify the amount J.T. would suffer. Further, when asked whether the harm involved in a transfer would be serious and enduring harm, Dr. Rotman stated "[i]t is very difficult to say exactly that there will not be harm later on." He felt that there were "too many factors" to consider to ascertain the degree of harm that would result.
Significantly, at the visits on September 27, 28, 29 and 30, and October 4, J.T. had to be reassured all the time that the foster mother was not far away and the door to the waiting room where the foster mother remained could not be closed. J.T. constantly wanted to know "where's mother?" When he told J.T. that she would be seeing her biological mother the next day, J.T. did not wish to discuss the subject at all. Dr. Rotman was of the opinion that the foster mother did not actively interfere with the visits, but that her presence affected the child's behavior to some degree.
Dr. Rotman constantly referred to how the passage of time has made his predictions more difficult and less certain. He said his "concern today is as it was last  two weeks ago when we met, is what the passage of time has done here. And I will be honest with the Court and everybody here, that's my concern." He was very clear in his testimony that he feels a lot less certain now that a transfer can be made without traumatizing J.T. because the longer J.T. has remained in the foster home, the more difficult the transfer has become.
Dr. Richard Reichbart, a clinical psychologist, testified for the foster mother. He had treated J.T. twenty times between December 30, 1992, and April 16, 1993. Some of the time, J.T. was with her biological mother. He testified that there is no way any child of the age of three and one-half years old "will not be traumatized by a transfer to a parent, however good that parent might be." Applying that to J.T., he stated:

*184 This is a child who has only known one mother, the person she calls mother. Children at different development stages undergo different kinds of trauma. This child at the time I saw her was three and a half. A child builds up her or his knowledge of the world based upon the particular caretaker, whether mother or father, that has been closest to him. The mother really creates an internal sense of the world for the child.
We know with very young children that if they don't have a mother, they literally become psychotic, if they have one to two, you know, different people and not one constant figure because they have not built up a secure, constant object world inside them. They need a constant figure there so that they know when they cry or they scream, when they need to be fed, when they're frightened, they know how they will be held, they know that there will be somebody there for them.... If they don't have that constant sense, they can't distinguish themselves sometimes from the outside world. You get really tremendous pathology. So a very young child without a constant mother is a tremendous risk.
* * * * * * * *
[J.T.] is particularly at risk for a variety of reasons. One is, this has been her only mother. She hasn't gone through any transfers prior to this. This is the only mother she knows. This is the only language she knows. This is English. She seems to have an attention deficit disorder. She has difficulty separating to start with. So she hasn't been able to build up a constant sense of herself and a constant sense of somebody outside being there for her. She's undergoing  she's really under going what I consider a regression at this point.
Dr. Reichbart testified further that J.T. will continue to require therapy regardless of whether a transfer occurs. He stated if J.T. was taken away from her foster mother he was certain "there would be harm to the child." His reasons for this conclusion were as follows:
I base it on the fact that her trust of the world, her ability to trust that people are going to be there for her, is tied into this foster mother, and if she is suddenly put with another mother, however wonderful that mother may happen to be, given these circumstances, given the way she is as a child, I don't think that she would be able to, as she grows up, be able to have relationships with other people without, intimate relations with other people without being absolutely terrified that they will leave as well.
While Dr. Reichbart felt great sympathy for the biological mother, he nonetheless stated "the child I think would be much more injured by being transferred to the biological mother." He was also of the opinion that J.T. had not bonded with her biological mother. He made it clear that he believed that "[i]f the transfer were to occur, I think that she would be traumatized, and I would *185 be concerned it would be lasting. I think there's a risk of serious and lasting damage." Further, Dr. Reichbart stated that he held such an opinion when originally examining the case, but did not express it because "I have never been asked these questions."
Dr. Toby B. Kaufman, a psychologist, submitted a report dated September 10, 1993. The trial judge excluded it from evidence, but we directed that it be made part of the appendix. We consider it as evidence since we find the failure to consider it below was a mistaken exercise of discretion in view of our remand decision.
Dr. Kaufman provided therapy to J.T. at the request of the foster mother commencing August 13, 1993, and on six additional dates thereafter. Dr. Kaufman expressed the following pertinent opinion:
[R]emoving [J.T.] from the only psychological parent and home she has ever known would likely cause irreparable harm to her emotionally and developmentally. [J.T.] is a child who currently displays emotional and developmental difficulties related to her early history and her current situation (i.e. she is aware of the pending transfer of custody and she has already reacted severely to it). Actually transferring this child to anyone, no matter how suited and competent that person may be, is in my opinion contrary to the doctrine of best interest of the child and, in a sense, represents emotional abuse of this child because of the clearly known trauma that would be imposed on this child.
She stated "the probability or irreparable damage to this child in the event the transfer takes place is overwhelming." She concluded that "[s]eparating from [the foster mother] and her children will in all probability cause [J.T.] severe permanent emotional damage which no amount of therapy will rectify."
In arriving at his decision on October 7, 1993, that J.T. should be transferred to her biological mother, the trial judge stated:
There is no doubt it will be difficult. There is no doubt that there would be some trauma and therefore some harm. And there is no doubt that bonding has taken place because of  and has probably solidified because of delays by the Court system, by DYFS, by the legal machinations and maneuverings, but Dr. Reichbard (sic) has a recommendation, yet what is it based on? On a possible attention disorder, on certain self-esteem problems, or flirtatiousness. I just don't think that *186 that's enough. There's trauma in every case such as this. There's difficulty in every case such as this.
* * * * * * * *
Certainly there will be harm. But does the harm reach the level talked about in these cases, and has it been shown to this Court clearly and convincingly?
Dr. Rotman says it's impossible really to quantify, it's difficult to say. Sure, it exists.
* * * * * * * *
I don't believe he used the term grave, but he did say it would be difficult and get more difficult. And if it's going to be difficult, and if it's difficult to say what the harm might measure up to be, that pure and simple does not amount to clear and convincing evidence.
* * * * * * * *
I cannot and will not undo the termination that has been upheld, to terminate  the non-termination ruling abides. If there's a problem down the road, I guess there can always be another application, but for now that ruling which has been upheld should abide, and there should be transfer without undue delay.
* * * * * * * *
I found that there should be nontermination, and on the law after this hearing that there should be a transfer.

III. LEGAL ANALYSIS

Termination cases involving rehabilitated biological parents on the one hand, and excellent foster parents with whom a child has bonded on the other hand, are always difficult to decide. This case has been made much more complex by the unwarranted delay in deciding the complaint for termination and the ensuing events. In our remand decision, we affirmed the dismissal of the complaint without much comment because we did not wish to further complicate the ongoing process.
The trial judge should have dismissed the complaint at the conclusion of the trial on October 31, 1991. At that time the judge found that DYFS had failed to establish by clear and convincing evidence that the biological mother's request for unification had been fully explored. Although DYFS had established its efforts to place the child with relatives, the judge was obligated to decide *187 based on the evidence presented. A.W., supra, 103 N.J. at 608-610, 512 A.2d 438, instructs that unless all reasonable alternatives to termination have been considered, the complaint should be dismissed. Not only should the complaint have been dismissed on October 31, 1991, but DYFS alone should have been left with the continuing responsibility of providing for the child's needs, including drafting a plan for permanent placement of the child. A.W. recognizes that DYFS is especially better equipped to provide these services than judges. Id. at 600, 512 A.2d 438. In the process of effectuating the legislative policy, a judge must be careful not to usurp the function delegated to DYFS. Id. at 602, 512 A.2d 438.
The failure of the judge to dismiss the complaint on October 31, 1991, rather than hold onto the case, has made unification more difficult. Termination complaints should be decided expeditiously. See N.J.S.A. 30:4C-20; Matter of Baby M, 109 N.J. 396, 466, 537 A.2d 1227 (1988); A.W., supra, 103 N.J. at 618, 512 A.2d 438. The order dismissing the complaint was signed on December 4, 1992, some thirteen months later. The fact that the complaint was dismissed without prejudice is not significant because the best interests of the child dictate that it could not have been otherwise. In other words, a new complaint can be filed.
The evidence is substantial that the bonding process with the foster mother was well underway by the time the evidence relative to the complaint for termination was presented on October 30, 1991. See Sees v. Baber, 74 N.J. 201, 222-23, 377 A.2d 628 (1977). By that time, the child had been with the foster mother close to two years, the first fifteen months of which passed without the natural mother ever contacting DYFS to request visitations. The "bonding that takes place before a termination petition has been decided serves to decrease the potential for eventual reunification." Matter of Guardianship of J.C., 129 N.J. 1, 29, 608 A.2d 1312 (1992). (Clifford, J., concurring).
*188 A substantial portion of the bonding with the foster mother was caused by the undemonstrated interest on the part of the mother. The biological mother made no attempts to visit the child or to take custody of the child between the time the mother was discharged from the hospital on November 25, 1989, and February 26, 1991, a period of approximately fifteen months. Even if DYFS had taken further steps toward unification between February 26, 1991, and October 31, 1991, a large portion of that time in all likelihood would have been required to plan for and to effectuate unification, if indeed that was possible. After all, the biological mother was a cocaine addict when J.T. was born, and four months before J.T.'s birth DYFS was called in to investigate a complaint that she had been neglecting her two other children, ages one and two years old. The point to be made is that if the complaint had been dismissed on October 31, 1991, and the unification process had been instituted then, rather than many months later, the prospects for unification would have been much better.

IV. CONCLUSIONS

The scope of appellate review in a nonjury case is limited. The factual findings which undergird a judgment in such a case should not be disturbed unless "they are so wholly insupportable as to result in a denial of justice," and should be upheld whenever they are "supported by adequate, substantial and credible evidence." Rova Farms Resort, Inc. v. Investors Ins. Co. of America, 65 N.J. 474, 483-84, 323 A.2d 495 (1974); Meshinsky v. Nichols Yacht Sales, Inc., 110 N.J. 464, 475, 541 A.2d 1063 (1988). There are two exceptions to this general rule which are involved here that broadens that scope. First, where the judge goes so wide of the mark as to be "clearly mistaken and so plainly unwarranted that the interests of justice demand intervention and correction." Formosa v. Equitable Life Assurance Soc'y, 166 N.J. Super. 8, 20, 398 A.2d 1301 (App.Div. 1979); certif. denied, 81 N.J. 53, 404 A.2d 1153 (1979); Maggio v. Pruzansky, 222 N.J. Super. 567, 577, 537 A.2d 756 (App.Div. 1988). Second, "where the *189 focus of the dispute is not credibility but, rather, alleged error in the trial judge's evaluation of the underlying facts and the implications to be drawn therefrom," the traditional scope of review is expanded. Snyder Realty, Inc. v. BMW of N. Amer., Inc., 233 N.J. Super. 65, 69, 558 A.2d 28 (App.Div.), certif. denied, 117 N.J. 165, 564 A.2d 883 (1989).
We made clear in our remand decision that any plan for unification was not workable if "separating the child from her foster mother would cause serious and enduring emotional or psychological harm. In re J.C., supra, 129 N.J. at 19, 608 A.2d 1312. To be sure, the quality of the child's relationship with his or her natural parents, id. at 18, 608 A.2d 1312, must be considered also in assessing the existence, nature and extent of the harm facing the child." Id. at 19, 608 A.2d 1312.
We agree with the foster mother and DYFS that the trial judge's evaluation of the evidence submitted by the experts and the implications to be drawn therefrom went so wide of the mark, that the interests of justice demand intervention and correction. All four experts agree that J.T.'s relationship with the foster mother is excellent, and that a very intense emotional bond exists between J.T., the foster mother and her children. The child has bonded with the foster mother for some time, and she is the only mother J.T. has known. On the other hand, Dr. Rotman described J.T.'s relationship with the biological mother as being positive at times while they were in his office which he described as a "very sterile atmosphere." This was his opinion after approximately eight months of office visits. Our careful study of the testimony and reports leads us to conclude that the quality of the relationship between J.T. and her biological mother, at best, is not good. Dr. Rotman did not feel that the foster mother actively interfered with the visits, and he did not insist that the foster mother not accompany J.T. to his office.
On the issue of harm to J.T. if unification should occur, three experts (Dr. Dyer, Dr. Reichbart and Dr. Kaufman) expressed the opinion that a transfer would cause serious and *190 enduring emotional or psychological harm. Dr. Rotman though less specific, stated that the transfer "would be very, very traumatic. It would be difficult.... It's going to be very, very rough for this child." He said the term difficult means "traumatic." When asked whether the harm would be serious and enduring, he stated "it is very difficult to say exactly that there will not be harm later on." Despite the fact that the judge accepted as true the foregoing evidence, he nonetheless concluded that the evidence did not clearly and convincingly establish that J.T. would suffer serious and enduring emotional or psychological harm if unification occurred.
"As tragic as the consequences to the parents of the loss of their children may be, we cannot ignore evidence of serious injury. It is inappropriate to disregard a clear and essentially undisputed showing of such injury and its probable consequences...." A.W., supra, 103 N.J. at 614, 512 A.2d 438.
Here, the judge was apparently of the view that absolute certainty of serious and enduring harm was required to satisfy the burden of proof. Not surprisingly, such long-term predictions cannot be made with absolute certainty, especially in family matters, and our law does not require the proofs to rise to that level. Clear and convincing means "a firm belief or conviction as to the truth of the allegations sought to be established." In re Boardwalk Regency Casino License Application, 180 N.J. Super. 324, 339, 434 A.2d 1111 (App.Div. 1981). The psychological evidence presented on the point was overwhelming. Such compelling evidence clearly and convincingly established the required harm.
As stated in State v. Johnson, 42 N.J. 146, 162, 199 A.2d 809 (1964), we hold to a "definite conviction that the judge went so wide of the mark, a mistake must have been made." The evidence was virtually unanimous that a transfer of J.T. to her biological mother would cause serious and enduring emotional or psychological harm. The child's best interests require us to correct that mistake and reverse the October 14, 1993, order.
*191 Finally, we note that the judge seemed somewhat confused as to whether our affirmance of the dismissal of the termination complaint meant unification was the only option remaining. We never intended to convey that impression. In our remand decision we stated clearly that a transfer of J.T. to her biological mother should not automatically follow dismissal of the termination complaint because "the potential harm to J.T. if she is separated from her foster mother" could not be ignored. Indeed, J.C. instructs that if termination is denied and unification would cause serious and enduring emotional or psychological harm, "[t]hat does not mean, however, that termination may not be an appropriate resolution." 129 N.J. at 25, 608 A.2d 1312. This language suggests that under these special circumstances, termination pursuant to Sorentino v. Family & Children's Soc'y of Elizabeth, 74 N.J. 313, 378 A.2d 18 (1977), and In re Guardianship of J.R., 174 N.J. Super. 211, 416 A.2d 62 (App.Div. 1980), is still a viable option. While A.W. refined Sorentino and J.C. restricted its application, Sorentino has not been overturned.
The order dated October 14, 1993, is reversed. J.T. shall remain under the custody, care and supervision of DYFS. DYFS is directed to proceed with a plan for permanency in the life of J.T. The status quo, however, is to be maintained until January 3, 1994, to permit consideration of a petition for certification.
Reversed.