**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4727-15T2

NEW JERSEY DIVISION OF CHILD
PROTECTION AND PERMANENCY,

    Plaintiff-Respondent,

v.

T.Y.F.,

    Defendant-Appellant,

and

A.D.R.,

    Defendant.

_____

IN THE MATTER OF THE GUARDIANSHIP
OF T.H.S.F. and T.S.F.,

    Minors.

_____

        Submitted April 5, 2017 — Decided May 30, 2017

        Before Judges Alvarez and Manahan.

        On appeal from Superior Court of New Jersey,
        Chancery Division, Family Part, Essex County,
        Docket No. FG-07-129-16.

        Joseph E. Krakora, Public Defender, attorney
        for appellant (Durrell Wachtler Ciccia,
        Designated Counsel, on the brief).

Christopher S. Porrino, Attorney General, attorney for respondent (Andrea M. Silkowitz, Assistant Attorney General, of counsel; Chanel Van Dyke, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors T.H.S.F. and T.F.S. (Lisa M. Black, Designated Counsel, on the brief).

PER CURIAM

Defendant T.Y.F. appeals from the June 20, 2016 Family Part order terminating his parental rights of his two daughters, T.H.S.F. (Tara) and T.S.F. (Tia).[1] Defendant contends the Division of Child Protection and Permanency (the Division) failed to prove the four prongs of the best interests standard of N.J.S.A. 30:4C-15.1(a)(1)-(4) by clear and convincing evidence. The Law Guardian joins with the Division in urging we affirm the judgment. A.D.R. (Amy), the biological mother of Tara and Tia, gave a voluntary identified surrender on the first day of the guardianship trial and is not a party to this appeal. Based upon our review of the record and applicable law, we are satisfied the evidence in favor of the guardianship petition adequately supports the termination of defendant's parental rights. See, e.g., N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007) (holding that a

---

[1] We utilize fictitious names for the parties and the children for the purpose of confidentiality.

reviewing court should uphold the factual findings respecting the termination of parental rights if they are supported by substantial and credible evidence in the record as a whole). Accordingly, we affirm.

I.

We discern the following pertinent facts from the record. Defendant and Amy are the biological parents of Tara and Tia. Tara was born in September 2013. Tia was born in September 2014. On October 24, 2013, the Division received a referral from a social worker from the Department of Veteran Affairs (VA) reporting concerns for Tara. The social worker reported that she smelled marijuana when she visited defendant's home. At the time of the referral, defendant was also on the phone, via three-way calling, with the Division's screener and the VA social worker.

Later that day, a Division caseworker arrived at the family's home. Defendant and Amy did not deny smoking marijuana in the home. However, Amy denied smoking marijuana since being pregnant and giving birth. Both defendant and Amy denied any other substance abuse. Defendant advised that he was diagnosed with

post-traumatic stress disorder (PTSD) in 2011, but did not comply with the recommended treatment and self-medicates with marijuana.[2]

After an attempted suicide by overdose on painkillers in June 2012, defendant ceased taking his prescribed medication. He denied currently having suicidal ideation. Defendant was previously hospitalized in August 2011, for inpatient treatments related to substance abuse and mental health issues, but failed to comply with outpatient treatment as recommended. He reported receiving therapy twice a week at the Veterans' Administration (VA) Hospital, but stopped treatment around Tara's birth.

Defendant and Amy stated that defendant would care for Tara when Amy returned to work and that he would only smoke when Tara was asleep. In response, the caseworker informed them that marijuana should never be used, as they are Tara's primary caregivers, and warned of Tara's removal by the Division if the marijuana use persisted. The caseworker concluded that there was no evidence Tara was abused or neglected, but that the marijuana use compromised Tara's well-being.

---

[2] Defendant enlisted into the military in 2005. In 2007, while deployed in Iraq, a bombing caused injuries to both legs, requiring surgery. In 2008, defendant received a "Less than Honorable Discharge" from the military, which was subsequently amended to "General Under Honorable Conditions."

A few days later, the caseworker met with defendant and Amy to advise them that their case was being transferred from the Essex South Local Office to the Essex North Local Office due to Amy's mother's, A.R. (Alice), employment at the Essex South Local Office. The caseworker further stated that until all Division assessments were completed, Tara could not be left alone with defendant. Thus, another adult would have to be present in Amy's absence to supervise.

On October 31, 2013, the investigating caseworker listened to the original referral call and learned additional information not provided by the screener in the referral summary. Thereafter, the caseworker contacted Alice to elicit further information, which included past domestic violence between defendant and Amy. Alice stated she would be a resource for Tara if needed.

Subsequently, the caseworker visited defendant and Amy to express the Division's concerns regarding defendant as a primary caregiver to Tara due to his admitted daily marijuana use, mental health issues, and possible domestic violence. The Division scheduled Certified Alcohol and Drug Counselor (CADC) assessments for both defendant and Amy, as well as a psychological evaluation for defendant. Furthermore, the caseworker advised them that the Division would be seeking guardianship of Tara. After discussing the implementation of a safety protection plan, it was agreed upon

that Amy and Tara would stay with a family friend until the issue was addressed in court.

The next day, the caseworker made an unannounced visit to the friend's home where Amy said they would be. As a result of that visit, the caseworker learned that defendant and Amy had violated the safety protection plan. An emergency Dodd removal, pursuant to N.J.S.A. 9:6-8.29, was executed on November 1, 2013.[3] Amy consented to the removal; defendant was not home at the time. Tara was placed with Alice.

On November 4, 2013, the Division filed a verified complaint seeking custody, care and supervision of Tara.[4] An order to show cause (OTSC) hearing was held on the same day, at which time the judge granted the Division custody of Tara due to the violation of the safety protection plan. On the return date of the OTSC, the judge held that Tara was to remain in the Division's custody. Furthermore, both defendant and Amy were to comply with substance abuse and psychological evaluations.[5] Compliance hearings were

---

[3] A Dodd removal is an emergency removal of a child which does not require a court order. N.J. Div. of Youth & Family Servs. v. P.W.R., 205 N.J. 17, 26 n.11 (2011) (citing N.J.S.A. 9:6-8.21 to -8.82).

[4] When the complaint was originally prepared, the Division sought care and supervision of Tara. The complaint was amended to seek custody of Tara as a result of the emergency Dodd removal.

[5] At this time, Judge Ronald D. Wigler recused himself from the case, as he had prosecuted defendant's sister in another matter,

held on March 25, April 30, and July 16, 2014, during which the provisions of the prior order were continued.

On three separate occasions in November 2013, defendant did not attend his Division-arranged CADC assessment with Catholic Charities, indicating that he preferred to be evaluated at the VA Hospital and did not wish to duplicate services. Therefore, Catholic Charities closed defendant's case.

Defendant began outpatient substance abuse treatment at the VA Hospital where he received individual therapy, anger management, and drug counseling. While defendant expressed an interest in receiving inpatient treatment, the VA hospital staff questioned his ability to participate in an inpatient treatment program due to his inconsistent performance in outpatient treatment. Notwithstanding, defendant was admitted to the VA Hospital for completion of an inpatient substance abuse program, which he completed on March 6, 2014. Defendant was then discharged from a subsequent ninety-day outpatient program at the VA Hospital due to erratic attendance.

who was named as a potential relative resource in this case. It was later determined that she had violations which precluded licensing and thus, she was not approved for placement. The Division additionally assessed defendant's other sister as a placement, but she eventually withdrew from consideration.

A-4727-15T2

On May 9, 2014, defendant had a mental health screening at the VA Hospital, which recommended that he receive PTSD treatment, but not substance abuse treatment. Defendant also had a psychiatric evaluation with Dr. Samiris Sostre on May 12, 2014. During this evaluation, defendant disclosed that he would begin psychiatric treatment at the VA Hospital for his PTSD. Dr. Sostre recommended that defendant continue with PTSD treatment; continue psychiatric treatment for mood instability, depression, and anxiety; and manage his PTSD symptoms without illicit substances; complete substance abuse treatment and maintain his sobriety; and receive individual counseling.

In mid-September 2014, the Division received a referral reporting concerns that Amy intended to give birth out-of-state to avoid removal of the child. The Division then received another referral stating Amy was scheduled for a cesarean section on September 9, 2014, but did not go to the hospital and did not return the doctor's calls. The reporter expressed further concerns that Amy was using drugs and might be harming the baby by delaying delivery, and that defendant was unstable.

The Division received a third referral on September 22, 2014, from an employee at University Hospital reporting that Amy gave birth to a healthy baby girl (Tia) on September 18, 2014, and was discharged from the hospital. Shortly after Tia's birth, the

8

Division executed an emergency Dodd removal and placed Tia in a foster home on September 23, 2014. On September 24, 2014, the Division filed an amended verified complaint for, and was subsequently granted custody of Tia, as a result of defendant and Amy's noncompliance with recommended services.

At this time, defendant and Amy were no longer presenting as a couple and visitation proceeded through Family Connections—Reunity House Program (Reunity House). A few days later, the Division arranged a visit for defendant at the Division office with Tia and Tara after he missed his visit at the Reunity House. Defendant was eventually terminated from Reunity House in December 2014, due to his "pattern of inconsistency to visitations and parenting skills" as he had attended three of thirteen scheduled visits, five of nine parenting skills groups, and none of the two individual parenting classes.

On October 15, 2014, the judge approved the Division's plan of reunification of the children with either parent within three-to-six-months because of their partial completion and agreement to attend services required for reunification to occur. Further permanency and compliance review hearings were held on January 15 and April 15, 2015. However, on April 15, defendant and Amy were unable to adequately care for the children because neither had stable housing. A permanency order was entered on July 30, 2015,

finding that the Division's plan of termination of parental rights followed by adoption of the children was appropriate. The judge, in entering the order, noted:

> [Amy] has unaddressed mental health and substance abuse issues [and] . . . [defendant] has unaddressed mental health and domestic violence issues as a result of [their] non-compliance with recommended services to date. [Amy] and [defendant] also lack stable and appropriate housing at this time, and inconsistently visit the children. The children who are currently residing with their maternal grandmother, who is interested in adopting the children, deserve permanency.

On the same day, the judge ordered defendant and Amy to be fully compliant with all services.[6]

Between October 2014 and July 2015, defendant completed a six-week curriculum of domestic violence services treatment at the Men/Women for Peace Program at Babyland, which the Division had shortened from twelve weeks. The Division also referred defendant for individual counseling at the Family Center of Montclair. Nonetheless, in January 2015, the Family Center of Montclair advised the Division that defendant was non-compliant with PTSD treatment after he attended only one session and missed five. In February 2015, defendant was also terminated from intensive case

---

[6] At this time, the judge also found Tara and Tia were not subject to the Indian Child Welfare Act.

management at the VA hospital after his Veteran's Section 8 Voucher was revoked, effective November 2014.

## II.

On January 29, 2015, Dr. Frank J. Dyer, Ph.D., issued a report relating to the results of his psychological examination of defendant and Amy, and separate bonding evaluations of Tara and Tia with defendant, Amy and Alice. Dr. Dyer noted defendant denied any recent use of marijuana. Further, Dr. Dyer observed that defendant is "an individual of normal intelligence who is currently free of mood disorder and is in satisfactory contact with reality, but who maintains a stance of denial with respect to his contribution to the situation of his children." Dr. Dyer diagnosed defendant with chronic PTSD, depressive disorder, cannabis abuse in sustained remission, and a personality disorder with paranoid and schizotypal features.

Based on his observations during the psychological and bonding evaluations, as well as his thorough review of the Division's file, Dr. Dyer recommended the Division not consider defendant as a viable candidate for custody of Tara and Tia. Dr. Dyer opined that defendant's "psychological functioning is too disorganized to permit him to appreciate the needs of a young child or to respond appropriately to those needs. . . . The subject has a great deal of trouble in putting the welfare of a child

above his own on a consistent basis." Notwithstanding, Dr. Dyer noted that the children had a positive connection with defendant and it would be of significant benefit to both Tara and Tia to have contact with both their parents.

Dr. Dyer submitted a supplemental report on May 31, 2016, following his review of additional records. While Dr. Dyer did not "opine on the ultimate legal issue of termination of parental rights" he did "offer an opinion with reasonable psychological certainty that continuing to pursue a case goal of resource home adoption for [Tara] and [Tia] by their grandmother, [Alice], would be an appropriate case goal."

Dr. Minerva C. Gabriel, Ph.D. conducted a psychological evaluation of defendant on November 12 and 13, 2015, and February 6, 2016. Dr. Gabriel performed a bonding evaluation between defendant and the children on February 17, 2016. Based upon her assessments, Dr. Gabriel noted in her report dated February 25, 2016, that defendant could "provide proper parenting for his daughters if he continues his counseling session and taking his psychotropic medications." Thus, Dr. Gabriel recommended that defendant should be awarded custody of the children.

On September 11, 2015, the judge entered an OTSC on the guardianship complaint. Additional reviews were held on November 13 and December 16, 2015, and February 16 and March 16, 2016.

12

Prior to the start of the guardianship trial, Amy executed a voluntary surrender of her parental rights to Tara and Tia to Alice. The guardianship and permanency trial took place over two days. Dr. Dyer and Tia Hurell, a Division caseworker, testified on behalf of the Division. Defendant and Dr. Gabriel testified on behalf of the defense.

Dr. Dyer testified consistently with his report. As to defendant's substance abuse, Dr. Dyer testified that defendant "as having continuing symptoms of PTSD, which means that there would be further continuing motivation for him to resort to the substance that, in his view, would prove to be the most effective agent for relieving his symptoms." Dr. Dyer further noted, "the other overshadowing issue is [defendant's] eccentric thinking processes and his vulnerability to lapses in his contact with reality, which also show up in his testing, and were evident behaviorally when [I] observed him with the two children." As to defendant's medications, Dr. Dyer stated, given his diagnosis, "it would be critical for him to resume taking his medications with respect to his ability to achieve adequate parenting capacity."

Dr. Dyer also testified as to defendant's bonding evaluation with Tara and Tia, where he found the children did "have a degree of positive connection to [defendant], but at the same time, there's a great deal of ambivalence[.]" He further testified that

13                                                                A-4727-15T2

while defendant and the children have a dysfunctional parent child-dynamic, the children are emotionally invested and profoundly attached to Alice. Moreover, Dr. Dyer testified that the termination of defendant's parental rights would not be a "loss that would rise to the level of anything that would cause serious psychological harm or any kind of long lasting consequences to these children." The judge found Dr. Dyer's testimony to be extremely credible and well-grounded in his review of the record, knowledge of the case, and psychological and bonding evaluations.

Next, Hurell testified as the custodian of records and current adoption worker for the family. Adoption remained the Division's goal in this case. Hurell testified that defendant currently resides in a three-bedroom apartment that is in disarray, but appropriate. Hurell described defendant as "up and down" because sometimes he would be enthusiastic and sometimes "a little agitated." She noted that defendant was inconsistent with his compliance with services referred by the Division at the time of the children's removal. This included individual therapy at the Family Center of Montclair, domestic violence services at Babyland, and couples counseling with Family Connections. According to Hurell, the Division remained concerned with defendant's noncompliance with VA Hospital services, such as his PTSD services and medication monitoring. Hurell also testified

14

that last time she received proof from defendant that he had refilled his prescription was in December 2015.

As to visitation, Hurell testified that the Division initially permitted defendant to have liberal visitation, where either Alice or a family friend supervised the visits. However, defendant was then referred to Reunity House, but was discharged in December 2014, for noncompliance, and visitation was now held at the Division office. Defendant's attendance continued to be inconsistent and tardy. Although defendant engaged well with the children, the Division remained concerned with his mental health and substance abuse issues. Moreover, the Division does not believe that defendant should be given more time to complete his services and demonstrate his ability to maintain stability.

Hurell testified that under the Division's permanency plan, Alice intends to adopt both Tara and Tia and there were no concerns relating to Alice's relationship with her granddaughters. The judge accepted Hurell's testimony as credible, concluding Alice was doing "an excellent job in meeting the children's needs."

Defendant testified on his own behalf. Defendant conceded that the last time he filled his prescription for the PTSD and anxiety medications were six months earlier. He posited, however, that he has never stopped taking his medications, as they are prescribed on an "as-needed" basis. Defendant acknowledged his

noncompliance with multiple VA services and his inconsistency with visitation. On cross, defendant initially claimed that he completed one parenting class at Reunity House, although the records indicate that he never completed a parenting class. Defendant also testified that at the time he was attending one-on-one counseling.

Next, Dr. Gabriel testified and recommended that defendant's parental rights not be terminated, although she recognized defendant has a number of psychological issues for which he must continue to seek treatment and take medication. Dr. Gabriel stated, even though the children spend significantly more time with Alice and it would be expected that their bonds would be different, the children's bond with Alice was the same as their bond with defendant. Finally, Dr. Gabriel recommended that defendant's parental rights not be terminated and for the children to continue to have contact with Alice.

On cross-examination, Dr. Gabriel testified that she had not reviewed defendant's substance abuse records, VA records from 2011-16, Reunity House records, the Division's contact sheets or police reports, but noted that a review of these records would have been significant to her evaluation. Dr. Gabriel was also unaware that defendant had not filled his prescriptions in six months, of his history of housing instability, his failure to

16

comply with outpatient treatment at the VA Hospital, and that he never completed parenting classes or any services at Babyland. As to her bonding evaluation, although she expected there to be a difference in the level of bonding, Dr. Gabriel found a similar bond to exist in the case of both defendant and Alice.

In an oral opinion, the judge determined the Division proved all four prongs of N.J.S.A. 30:4C-15.1 by clear and convincing evidence and entered a judgment of guardianship terminating the parental rights of both defendant and Amy to Tara and Tia. While the judge recognized defendant's affection for his two daughters, he found defendant's failure to comply and be consistent with services and visitation demonstrated his inability to parent.

Finding Dr. Dyer's evaluation to be more credible than Dr. Gabriel's, the judge further found that defendant has "severe emotional, behavioral, and personality issues that prevent him from parenting at this particular point in time." The judge found that Dr. Gabriel did not do "as comprehensive of a job in looking at records and reviewing and interviewing [defendant]."

The judge further found defendant required "a couple years of serious treatment and commitment on his part, which we haven't seen for the last three years, for him . . . to care for these children. . . . [T]here's no indication at this particular point that this is going to happen in the foreseeable future."

Further, the judge found the Division made reasonable efforts to provide services to defendant but that he was non-compliant. The judge further noted that although Tara and Tia had a relationship with defendant, it was limited. The judge found the children had bonded with Alice and any harm as a result of the termination of parental rights could be mitigated. A judgment of guardianship and termination was entered.

## III.

On appeal, defendant raises the following points:

### POINT I

THE TRIAL COURT INCORRECTLY APPLIED THE LEGAL PRINCIPLES GOVERNING TERMINATION OF PARENTAL RIGHTS MATTERS TO THE FACTS. THE RECORD FALLS SHORT OF SATISFYING THOSE EXACTING STANDARDS AND THEREFORE TERMINATION OF DEFENDANT'S PARENTAL RIGHTS SHOULD NOT BE AFFIRMED.

> A. The Trial Court Incorrectly Applied the Legal Principles Developed Under N.J.S.A. 30:4C-15.1(a)(1) and N.J.S.A. 30:4C-15.1(a)(2) to the Facts. Insufficient Evidence was Produced to Conclude That [Defendant] Was Unable or Unwilling to Meet his Children's Need For Permanency.

> B. The Trial Court's Legal Conclusion that the Third Prong Of N.J.S.A. 30:4C-15.1(a)(3) was Satisfied at a Clear and Convincing Level of Proof was Not Supported by Evidence in the Record.

18                                                          A-4727-15T2

C. Termination Of Parental Rights
Will Do More Harm Than Good.

POINT II

THE JUDGMENT TERMINATING [DEFENDANT'S] PARENTAL RIGHTS SHOULD BE REVERSED BECAUSE THE TRIAL COURT'S CONDUCT OF THE CASE DEPRIVED DEFENDANT OF THE LEVEL OF DUE PROCESS AND "FUNDAMENTAL FAIRNESS" THAT NEW JERSEY LAW REQUIRES IN DCPP MATTERS. (NOT RAISED BELOW)

The scope of review of a Family Part judge's termination of parental rights is limited. N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 552 (2014); M.M., supra, 189 N.J. at 278. A judge's findings may not be disturbed unless they are "so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 484 (1974) (citation omitted); see also N.J. Div. of Youth & Family Servs. v. P.P., 180 N.J. 494, 511 (2004). "A reviewing court should uphold the factual findings undergirding the trial court's decision if they are supported by 'adequate, substantial and credible evidence' on the record." M.M., supra, 189 N.J. at 279 (quoting In re Guardianship of J.T., 269 N.J. Super. 172, 188 (App. Div. 1993)).

As a general rule, an appellate court should also defer to the judge's credibility determinations. Ibid. Such deference is appropriate because the trial judge has a feel for the case and

"the opportunity to make first-hand credibility judgments about the witnesses who appear on the stand[.]" N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008); see also M.M., supra, 189 N.J. at 293. The trial court is best suited to assess credibility, weigh testimony, and develop a feel for the case. N.J. Div. of Youth & Family Servs. v. M.C. III, 201 N.J. 328, 342 (2010). Special deference is accorded to the Family Part's expertise. Id. at 343; Cesare v. Cesare, 154 N.J. 394, 413 (1998).

"Where the focus of the dispute is . . . alleged error in the trial judge's evaluation of the underlying facts and the implications to be drawn therefrom, the traditional scope of review is expanded." J.T., supra, 269 N.J. Super. at 188-89 (internal quotation marks omitted); see also, N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007). Deference is still appropriate even in that circumstance "unless the trial court's findings 'went so wide of the mark that a mistake must have been made.'" M.M., supra, 189 N.J. at 279 (quoting C.B. Snyder Realty, Inc. v. BMW of N. Am., Inc., 233 N.J. Super. 65, 69 (App. Div.), certif. denied, 117 N.J. 165 (1989)).

Nevertheless, the trial judge's legal conclusions, and the application of those conclusions to the facts, are subject to plenary review. Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995). We need not defer to the trial court's

legal conclusions reached from the established facts. See State v. Brown, 118 N.J. 595, 604 (1990). "If the trial court acts under a misconception of the applicable law," we need not defer to its ruling. Ibid.; see also N.J. Div. of Youth & Family Servs. v. R.L., 388 N.J. Super. 81, 89 (App. Div. 2006), certif. denied, 190 N.J. 257 (2007).

Parents have a constitutionally protected right to enjoy a relationship with their children. E.P., supra, 196 N.J. at 102; In re Guardianship of K.H.O., 161 N.J. 337, 346 (1999). Strict standards have consistently been imposed in the termination of parental rights. K.H.O., supra, 161 N.J. at 347. Termination of parental rights is considered an "extreme form of action," E.P., supra, 196 N.J. at 102, and "a weapon of last resort in the arsenal of state power." N.J. Div. of Youth and Family Servs. v. F.M., 211 N.J. 420, 447 (2012). To balance the parents' constitutional rights against potential harm to the child, when applying for guardianship, the Division must institute "a termination proceeding when such action would be in the best interest of the child." N.J. Div. of Youth & Family Servs. v. K.M., 136 N.J. 546, 557 (1994).

The Supreme Court first articulated the best interests standard in N.J. Div. of Youth & Family Srvs. v. A.W., 103 N.J. 591, 602-11 (1986). The Legislature subsequently amended Title

30 in 1991 to conform to the court's holding in A.W., codifying the standard at N.J.S.A. 30:4C-15.1(a). The statute provides that the Division must prove:

> (1) The child's safety, health or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;
>
> (3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.
>
> [N.J.S.A. 30:4C-15.1(a).]

The four factors are not independent of each other; rather, The "prongs are not discreet and separate," but overlap with each other. N.J. Div. of Youth & Family Srvs. v. I.S., 202 N.J. 145, 167 (2010) (quoting N.J. Div. of Youth & Family Srvs. v. G.L., 191 N.J. 596, 606-07 (2007)). "The considerations involved in determinations of parental fitness are 'extremely fact sensitive' and require particularized evidence that address the specific

circumstances in the given case."  K.H.O., supra, 161 N.J. at 348 (1999) (quoting In re Adoption of Children by L.A.S., 134 N.J. 127, 139 (1993)).

The burden of proof is on the Division to establish its case by a clear and convincing evidence standard.  Ibid.; In re Guardianship of J.N.H., 172 N.J. 440, 464 (2002); see also F.M., supra, 211 N.J. at 447-48 (citation omitted); P.P., supra, 180 N.J. at 511 ("On appeal, a reviewing court must determine whether a trial court's decision in respect of termination of parental rights was based on clear and convincing evidence supported by the record before the court.").

The first two prongs of the best interest standard, N.J.S.A. 30:4C-15.1(a)(1) and (2), are related "components of the harm requirement," and "evidence that supports one informs and may support the  other as part of the comprehensive basis for determining the best interests of the child."  In re Guardianship of D.M.H., 161 N.J. 365, 379 (1999).  Because here, the first two prongs of N.J.S.A. 30:4C-15.1(a) are factually intertwined, we "address prongs one and two of that test" together.  See E.P., supra, 196 N.J. at 104.

Under the first prong of the best interests standard, the Division must prove by clear and convincing evidence that "[t]he child's safety, health or development has been or will continue

23

to be endangered by the parental relationship."  N.J.S.A. 30:4C-15.1(a)(1).  "The harm shown . . . must be one that threatens the child's health and will likely have continuing deleterious effects on the child."  K.H.O., supra, 161 N.J. at 352.  "The potential return of a child to a parent may be so injurious that it would bar such an alternative."  A.W., supra, 103 N.J. at 605.

The absence of physical abuse or neglect is not conclusive and serious emotional and developmental injury should be regarded as injury to the child.  Ibid.  Moreover, trial courts must consider the potential psychological damage of reunification with a parent.  Ibid.  "[T]he psychological aspect of parenthood is more important in terms of the development of the child and its mental and emotional health than the coincidence of biological or natural parenthood."  Sees v. Baber, 74 N.J. 201, 222 (1977); see also In re Guardianship of K.L.F., 129 N.J. 32, 44 (1992) ("Serious and lasting emotional or psychological harm to children as the result of the action or inaction of their biological parents can constitute injury sufficient to authorize the termination of parental rights."); D.M.H., supra, 161 N.J. at 379 ("A parent's withdrawal of that solicitude, nurture, and care for an extended period of time is in itself a harm that endangers the health and development of the child.").

The second prong focuses on parental unfitness and overlaps with the proofs supporting the first prong. D.M.H., supra, 161 N.J. at 379. A trial court is required to determine whether it is "reasonably foreseeable that the parents can cease to inflict harm upon" the child. A.W., supra, 103 N.J. at 607. "No more and no less is required of them than that they will not place their children in substantial jeopardy to physical or mental health." Ibid. This prong may be satisfied "by indications of parental dereliction and irresponsibility, such as the parent's continued or recurrent drug abuse, the inability to provide a stable and protective home, [and] the withholding of parental attention and care . . . with the resultant neglect and lack of nurture for the child." K.H.O., supra, 161 N.J. at 353. This harm includes "evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child." N.J.S.A. 30:4C-15.1(a)(2).

Defendant argues that no objective evidence was submitted as to the level of harm defendant's marijuana use had on Tara and Tia. In reply, the Division argues that the judge's primary concern with defendant was not his cannabis dependency, but rather his noncompliance with services and his inconsistency with his PTSD medications. Additionally, defendant contends that the judge failed to make explicit, individualized findings as to prongs one

and two of the best interest test, and this is the result of the Division's failure to provide clear and convincing evidence.

There is ample support demonstrating the Division satisfied its burden under N.J.S.A. 30:4C-15.1(a)(1) and (2).[7] The judge noted that the case was three years old, and defendant had not been compliant with his prescribed medications for PTSD. Moreover, defendant's evaluations indicated that he needed to be appropriately taking his medications; which, despite defendant's position, were not prescribed on an "as-needed basis."

In reaching our determination, we do not overlook or minimize defendant's continuous use of marijuana as playing a role in the determination of risk. Our Supreme Court has acknowledged that ongoing and un-rehabilitated drug use can be harmful to children. K.H.O., supra, 161 N.J. at 363 (stating that a parent's inability to overcome his or her own addiction to care for a child constitutes the endangerment of that child).

Although the focus of the judge's findings of present and continued harm  was upon defendant's inability to treat his PTSD

---

[7] Notwithstanding, we note that the judge's findings relative to the first and second prongs were general rather than particularized.  The judge's reliance on the proofs in the record, without more, might have required a remand for additional fact finding had the record not been replete with steps taken by the Division toward reunification and defendant's consistent noncompliance with Division services.

and comply with VA services, defendant's cannabis dependence, even in remission, is an appropriate consideration whether his parenting posed a substantial risk of harm to Tara and Tia.

"Courts need not wait to act until a child is actually irreparably impaired by parental inattention or neglect." D.M.H., supra, 161 N.J. at 383 (citing A.W., supra, 103 N.J. at 616 n.14). Even were we to not consider the cannabis abuse of defendant, by his not adhering to the safety protection plan and by his consistently failing to comply with services, he exposed Tara and Tia to imminent danger. See ibid.

Under the third prong of the best interests standard, the Division must make "reasonable efforts to provide services to help the parent correct the circumstances" that necessitated removal and placement of the child in foster case. N.J.S.A. 30:4C-15.1(a)(3); K.H.O., supra, 161 N.J. at 354. "Reasonable efforts" may include parental consultation, plans for reunification, services essential to achieving reunification, notice to the family of the child's progress, and visitation facilitation. N.J.S.A. 30:4C-15.1(c). Those efforts depend upon the facts and circumstances of each case. D.M.H., supra, 161 N.J. at 390. The services provided to meet the child's need for permanency and the parent's right to reunification must be "coordinated" and must have a "realistic potential" to succeed. N.J. Div. of Youth &

Family Servs. v. J.Y., 352 N.J. Super. 245, 267 n.10 (App. Div. 2002) (quoting N.J.A.C. 10:133-1.3).

Despite the fact that the Division offered numerous services to defendant and attempted to facilitate reunification, the record demonstrates, as the judge found, defendant failed to be consistent with the services provided to him. The Division is not obligated to make continued efforts to provide services to individuals who refuse to engage. A.W., supra, 103 N.J. at 610. Defendant displayed a consistent refusal to complete services and learn from the services when he did attend, despite the Division's attempts at providing services aimed at reunification. Importantly, this court held in I.H.C., supra, 415 N.J. Super. at 576, that a parent's past conduct is relevant in determining his or her future conduct.

Here, there is sufficient credible evidence in the record supporting that "reasonable efforts" were made by the Division for reunification. We are satisfied from our review of the record that the Division presented clear and convincing evidence to satisfy the third prong.

We next address the fourth statutory prong requiring the court to determine "whether, after considering and balancing the two relationships, the child will suffer a greater harm from the termination of ties with her natural parents than from the

permanent disruption of her relationship with her foster parents."
K.H.O., supra, 161 N.J. at 355. The overriding consideration for
this prong is the child's need for permanency and stability. Id.
at 357. If a child can be returned to the parental home without
endangering the child's health and safety, the parent's right to
reunification takes precedence over the permanency plan. Ibid.;
A.W., supra, 103 N.J. at 607-09. The mere fact of a bond with the
foster parent does not alone justify the termination of parental
rights. K.L.F., supra, 129 N.J. at 44-45.

In meeting the fourth prong, the Division should adduce
testimony from a "well qualified expert who has had full
opportunity to make a comprehensive, objective, and informed
evaluation" of the child's relationship with the natural and foster
parents. In re Guardianship of J.C., 129 N.J. 1, 19 (1992).
"[T]ermination of parental rights likely will not do more harm
than good" where the child has bonded with foster parents in a
nurturing and safe home. E.P., supra, 196 N.J. at 108 (citations
omitted). Yet, "the Division must show 'that separating the child
from his or her foster parents would cause serious and enduring
emotional or psychological harm.'" Ibid. (quoting J.C., supra,
129 N.J. at 19).

Dr. Dyer noted that "[i]t is clear that [Tara] and [Tina]
are profoundly attached to their grandmother. If they were removed

from her care, both children would suffer a painful and disorienting loss."  As this court has held, children should not "languish indefinitely" in an out-of-home placement while a parent attempts to correct his or her parenting problems.  <u>N.J. Div. of Youth & Family Servs. v. S.F.</u>, 392 <u>N.J. Super.</u> 201, 209 (App. Div.), <u>certif. denied</u>, 192 <u>N.J.</u> 293 (2007) (citation omitted). The children have been living with their grandmother since infancy; a resource placement that was stable, secure, and loving.  <u>See In re Guardianship of J.E.D.</u>, 217 <u>N.J. Super.</u> 1, 17 (App. Div. 1987), <u>certif. denied</u>, 111 <u>N.J.</u> 637 (1988) (stating that when a resource parent wishes to adopt, an influential factor is introduced into the best interests analysis).  We are satisfied that the judge's conclusion that terminating parental rights to free the children for adoption would not do more harm than good finds  support in the record.

Finally, defendant argues that by failing to change venue due to Alice's "conflict of interest" as a DCPP caseworker, and due to a judicial conflict posed by a (recused) judge's former prosecution of defendant's sister, the proceedings were "fundamentally unfair."  Having considered this argument in light of the record, we conclude it is without sufficient merit to warrant discussion in a written opinion.  <u>R.</u> 2:11-3(e)(1)(E).

In sum, the evidence in favor of the guardianship petition adequately supported the termination of defendant's parental rights. See, e.g., M.M., supra, 189 N.J. at 279 (stating that a reviewing court should uphold the factual findings respecting the termination of parental rights if they are supported by substantial and credible evidence in the record as a whole).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4727-15T2