# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3876-17T2

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

M.T.,

      Defendant-Appellant,

and

C.T.,

      Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF J.T. and
Ja.T.,

      Minors.

_____

      Submitted January 29, 2019 – Decided March 5, 2019

      Before Judges Suter, Geiger and Firko.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Warren County, Docket No. FG-21-0111-18.

Joseph E. Krakora, Public Defender, attorney for appellant (Steven E. Miklosey, Designated Counsel, on the brief).

Gurbir S. Grewal, Attorney General, attorney for respondent (Jason W. Rockwell, Assistant Attorney General, of counsel; Peter D. Alvino, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors (Melissa R. Vance, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant M.T. (Mary)[1] appeals from a judgment terminating her parental rights to two of her sons, J.T. (John) and Ja.T. (James). Defendant C.T. (Carl) did not participate in the guardianship proceeding or this appeal. Mary contends the Division of Child Protection and Permanency (Division) failed to prove the second and fourth prongs of N.J.S.A. 30:4C-15.1(a) by clear and convincing evidence. The Law Guardian supports the termination on appeal as it did before the trial court.

---

[1] We use initials and pseudonyms for the defendants, their children, and another individual to protect their privacy. R. 1:38-3(d)(12).

N.J.S.A. 30:4C-15.1(a) requires the Division to petition for termination of parental rights "on the grounds of the best interests of the child" if the following criteria are met:

> (1) The child's safety, health or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.

The four prongs of the best interests standard "are not discrete and separate; they relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." N.J. Div. of Child Prot. & Permanency v. R.L.M., 236 N.J. 123, 145 (2018) (quoting In re Guardianship of K.H.O., 161 N.J. 337, 348 (1999)). "[P]arental fitness is the key to determining

the best interests of the child." Ibid. In guardianship cases, "the child's need for permanency and stability emerges as a central factor." Id. at 357 (citing In re Guardianship of J.C., 129 N.J. 1, 26 (1992)).

The Division filed a petition for guardianship pursuant to N.J.S.A. 30:4C-15 to -20, seeking to terminate the parental rights of Mary and Carl with respect to John and James.[2] In a comprehensive fifty-page written opinion, Judge Haekyoung Suh found the Division satisfied the four-prong test by clear and convincing evidence, and held termination was in the children's best interests. Based on our review of the record and applicable law, we are satisfied the evidence in favor of the guardianship petition adequately supports the termination of defendants' parental rights. See N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007) ("A reviewing court should uphold the factual findings undergirding the trial court's decision if they are supported by 'adequate, substantial and credible evidence' on the record." (quoting In re Guardianship of J.T., 269 N.J. Super. 172, 188 (App. Div. 1993))). Accordingly, we affirm.

The guardianship trial spanned thirteen days over three months. The Division moved 116 documents into evidence and presented testimony from five

---

[2] Defendants' two older sons are not the subject of this case.

caseworkers, a school principal, a licensed professional counselor, a nurse practitioner, and a licensed psychologist, Robert James Miller II, Ph.D. The Law Guardian presented the testimony of licensed psychologist Maureen Santina, Ph.D., and moved sixty exhibits into evidence. Mary testified and presented the testimony of licensed psychologist James Reynolds, Ph.D., and a school social worker. Mary moved three exhibits into evidence. Carl did not appear for trial or testify.

Mary and Carl were the parents of four sons, L.T. and V.T., born in 2001 and 2003, respectively, John, born in December 2004, and James, born in March 2006. Mary and Carl were married in 2009. All four boys suffered from emotional and behavioral issues. The Division received two referrals in November 2010 and one in December 2010 alleging physical abuse of the children. This led to the family receiving services from the Division's Family Preservation Services (FPS), which included home visits and therapy. Mary later revealed Carl physically abused the children by hitting them on their heads and beating them with belts almost daily after they became toddlers.

In early 2011, Mary was diagnosed with major depression. In August 2011, Carl beat and choked Mary in front of the children, resulting in his arrest and incarceration. Mary pursued relief under the Prevention of Domestic

Violence Act, N.J.S.A. 2C:25-17 to -35, and obtained a final restraining order against Carl. A July 2012 amended final restraining order prohibited Carl from having contact with the children. Carl had no further involvement with the children and his whereabouts are unknown.

After this incident, Mary and the children moved into a safe house for a month, followed by living in a homeless shelter for four months. In March 2012, Mary and the children moved into an apartment and she began working the night shift at a Wawa store. Two months later, Mary's boyfriend, C.C., who also worked at the store, moved into the residence.

In the spring of 2012, John underwent a psychological evaluation after he engaged in aggressive behavior at school. The evaluation revealed John had significant emotional and behavioral issues. In August 2012, John was diagnosed with Dissociative Disorder, which included rapid personality changes and intense outbursts. The psychiatrist recommended trauma-based psychotherapy and that he be taught behavioral management skills.

James was diagnosed with encopresis (fecal incontinence). He also displayed behavioral problems at school.

In December 2013, the Division received a referral Mary was not following through with services for the children. James's school also reported

an incident resulting from his incontinence. Mary agreed to take James to a specialist.

In January 2014, the Division received a referral from John's school reporting that C.C. hit one of the older boys with a shoe. Around this time, John was suspended from school because of his behavior. When he returned he was placed in a class for emotionally disturbed children.

In March 2014, FPS terminated services to the family after twenty-one sessions due to a "consistent lack of motivation" on Mary's part. Shortly thereafter, Mary and C.C. signed a case plan agreeing to comply with psychological evaluations for the children. In May 2014, Mary was hospitalized after she and C.C. broke up. C.C. left the residence for good four months later.

The Division executed a Dodd[3] removal in late October 2015. John and James were placed in separate resource homes. James's initial resource family could not cope with caring for him because of his incontinence and behavioral issues. In late 2015, he was placed with the resource parents who have since been awarded custody.

---

[3] A Dodd removal is an emergent removal of a minor child without a court order pursuant to N.J.S.A. 9:6-8.21 to -8.82, known as the Dodd Act. N.J. Div. of Youth & Family Servs. v. P.W.R., 205 N.J. 17, 26 n.11 (2011).

John was diagnosed with Disruptive Mood Dysregulation Disorder (DMDD) with Posttraumatic Stress Disorder (PTSD) symptoms. He was prescribed Risperdal to stabilize him, but he was removed from his first resource home because of his violent behavior. He was then placed with Kids Peace, an in-patient psychiatric facility. He was discharged about two months later and placed in a treatment home. In November 2017, he was placed with James in the same resource home.

Mary testified she had no further contact with Carl after obtaining the restraining order. She testified she had "intense" therapy after the incident with Carl but began having panic attacks in May 2012. She completed a program for victims of domestic violence that reduced the frequency of the panic attacks.

A case worker visit in February 2014 revealed clothes all over the floor, dirty dishes in the sink, and garbage in the residence that caused an odor. The Division provided Mary with wardrobes and dressers for the clothes. In mid-2014, Mary switched to the first shift at Wawa in order to care for the children after school, reducing her income. Facing eviction for non-payment of rent, Mary abandoned the apartment. The Division placed the family in motels for the next two months. During this period the case worker had difficulty

contacting Mary despite buying her a phone. Mary was not cooperative in keeping therapy appointments.

In November 2014, Mary agreed to participate with FPS and Family Promise, a homeless prevention program, but missed numerous scheduled appointments with FPS. Mary lost her job at Wawa in January 2015, then found a part-time job at a restaurant in April 2015, but quit two weeks later after suffering an injury at work.

In July 2015, Mary applied for and received food stamps, general cash assistance, and Medicaid. The food stamps were withheld after she did not attend scheduled social services appointments. Mary rejected the Division's offer of counseling and summer camp for the children. Mary told her caseworker that neither she nor the children needed therapy and she was frustrated by the whole situation.

School principal Christina Lauck testified that when James was first enrolled in 2015, he would often shut down and become non-communicative, and was often incontinent. It was difficult to contact and communicate with Mary regarding James's emotional issues or anything to do with school, including sending clothes and pull-ups for James. Soiled clothes sent home from school would still be in James's backpack when he returned the next day.

A-3876-17T2

In September 2015, Mary was again facing eviction. Attempts to contact Mary regarding her housing issue were unsuccessful. In late October 2015, Mary sought housing assistance from the County Board of Social Services after being homeless for several weeks. The Division executed a Dodd removal of all four children. Mary testified she was reluctant to permit the boys to be given psychotropic medication because she previously had a bad reaction when she was taking them. The Division obtained a court order to place John on the medication.

James "blossomed" when he was placed in the current resource home, according to Lauck. He went from a student who could barely write three or four sentences to receiving an award for an essay he wrote. He also improved emotionally and in social relationships with other students. Unfortunately, things changed for the worse when weekend visitations with Mary began in January 2017. Lauck stated James began regressing emotionally and behaviorally, and the fecal incontinence returned. By September 2017, after the visitations ended, James was "completely different," engaging in school activities in a meaningful way.

In July 2016, Mary obtained an apartment. She began receiving therapy in January 2017. She was promoted to night shift manager at Wawa in May

A-3876-17T2

2017, and testified she had friends who were able to watch the older boys while she was at work.

School social worker Amanda Matlee testified for Mary. She began counseling James at the start of the 2016-2017 school year. James was living in the resource home at the time. Matlee testified James's behavior began to deteriorate in the spring of 2017. This coincided with the Division's change of goal from termination of parental rights to reunification. Matlee wrote in James's Individualized Education Program: "This uncertainty is resulting in a regression of [James's] behavior at school with multiple episodes of him shutting down for extended periods of time."

The resource mother testified James was placed with her in December 2015, and John joined in November 2017. She had three other adopted children who were teenagers. She stated James's incontinence ended between the time he was first placed with her and January 2017. Initially, James would have "three and four-hour long meltdowns," but this subsided over time. The resource mother used relaxation techniques to help James. She related James started playing soccer and doing other outdoor activities.

Although James was initially excited when overnight visits with Mary began in January 2017, he started getting nervous as the visits approached and

11

resumed soiling himself. When the resource mother picked him up after the weekend visitations, James "looked a mess," and was very tired. He also began falling behind on school assignments and his behavior at school worsened. James told her the boys played video games all night keeping him awake. In addition, a cat kept waking him up and the boys fought a lot. The incontinence ended when the visits stopped.

Amanda Mayberry, a new case worker, testified Mary worked the night shift on weekends and would sleep all day. James told the case worker he was afraid to go on visitations because his brothers would hit and kick him. John told her he argued a lot with his two older brothers and they were "physical" towards James. Mayberry also stated James began "shutting down" at school and John became "increasingly aggressive." She stated these behaviors "decreased pretty significantly" after the weekend visitations stopped. Mayberry also testified Mary used babysitters who were not approved by the Division.

Mayberry experienced difficulty contacting Mary. During one visit, Mary "completely ignored [her] existence." In May 2017, the Division again provided rent assistance. Mayberry described Mary as being "compliant off and on" with FPS and Families First.

A-3876-17T2

John spent a few weeks at the resource home with James in the summer of 2017. After his placement in November, John adjusted well but had "ups and down[s]." By the time of trial, John was doing well in school and was in therapy. The resource mother testified she wanted to adopt James and her goal was to adopt John as well. She said gaining John's trust was a challenge but "everybody had been working very well with him." Significantly, the resource parents favored continued contact between John and James and Mary and their older brothers after adoption.

In September 2017, the Division received a referral that the two older children were home alone. A Division special response worker found the boys unsupervised leading to a Dodd removal of the two boys. Regarding the incident, Mary testified the man she was dating was in the house watching the boys when she left for work.

The Division sought to terminate Mary and Carl's parental rights after John and James were placed in resource homes, off and on, for nearly two years due to Mary's psychological and housing issues, as well as the boy's emotional and behavioral problems.

Mary testified she would be able to take care of John and James and meet their needs. She acknowledged the boys were "doing very well" in the resource

13

home and that it was "great" the resource parents took the time to work with them. Mary stated she would want to see John and James and would work with the resource parents if they were allowed to keep the boys.

Dr. Santina conducted a psychological evaluation of Mary; interviews of John, James, and the resource mother; and bonding evaluations of the boys with Mary and the resource parents. She found that Mary "has no record of responsible or stable independent social or financial or emotional functioning" and exhibited extreme levels of denial. In her report, Dr. Santina opined:

> It is my professional opinion that [Mary] has exhibited a pervasive lack of emotional engagement, commitment or protectiveness towards her children. They have suffered from physical abuse, witnessing domestic violence, emotional neglect and homelessness because of [Mary's] lack of responsible or responsive parenting. During this evaluation, [Mary] took no responsibility for her children's distress or the living conditions that traumati[z]ed them. She displaced responsibility onto her romantic partners, [the Division] and others. She denied documented failures on her part to address her problems or those of the children. She expressed the belief that there were no justifiable concerns by the Division that led to the removal of the children.

Dr. Santina pointed to Mary's failure to supervise the children during the weekend visitations, and opined Mary:

> presents as an egocentric woman who lacks empathy or a sense of responsibility towards others, including her children. She lacks willingness to examine her own

A-3876-17T2

behaviors that have led to her children suffering in various ways in her care. She has repeatedly abdicated her parental relationships and responsibilities and depended on others for the care of her children. She expected others to perform the care for her children that she herself resented.

Dr. Santina testified Mary failed to protect the children from men she was involved with. In addition, she had a personality disorder with narcissistic features, including an inability to take responsibility and to empathize. Dr. Santina concluded Mary was not "currently capable of providing safe and effective parenting for [John] and [James]. . . and is unlikely to become a safe and effective caregiver in the foreseeable future." She added:

[Mary] has been repeatedly noncompliant with services and shows no genuine motivation to address her personal and parental shortcomings. She exhibits no empathy or real concern for her sons. [T]here is a high likelihood that she will repeat past harmful emotional and behavioral patterns that would expose them to residential instability, emotional deprivation, social neglect and lack of appropriate supervision.

In her bonding evaluations, Dr. Santina found that both John and James had emotional attachments to Mary, but her interaction with the boys was largely activity-oriented, with very little emotional communication or guidance. Dr. Santina described the session as "benign but superficial and limited;" however,

15

she did not see any "overt concerns." She concluded the boys were attached and bonded to Mary, but that did not outweigh Mary's parental defects.

Dr. Santina found the interaction between the boys and the resource parents was quieter and less spontaneous than their interaction with Mary. James displayed a strong positive attachment to the resource parents. Since John was recently placed in their home, he had not yet formed a strong attachment to them. He responded positively to the resource parents and "emotional[ly] communicated with them." "No concerns were noted in the interactions between the resource parents and the boys." Dr. Santina found the boys' interaction with the resource parents "was more emotionally involved" than with Mary.

John told Dr. Santina he liked living with the resource parents and reuniting with James. He expressed sadness about being separated from Mary and said he wanted to live with her. James told Dr. Santina he liked living with the resource parents. "When asked his feelings about when he lived with his mother, he appeared tense and stated in a terse tone, 'good.'" He also stated that he looked forward to his weekly visits with Mary and he "sometimes misses being with her and would like to live with her."

Dr. Santina concluded both boys "presented as emotionally fragile," and Mary was not capable, or not motivated, to address those emotional needs. As to the resource parents, Dr. Santina stated:

> While it is unlikely that [John] has yet established a strong attachment to his new resource parents, the resource parents presented as capable of facilitating his growth and healing, as they have done with [James]. The resource parents presented as capable of amelioration [of] any distress that the boys may experience if their mother's parental rights were terminated. It is my professional opinion that termination of [Mary's] parental rights would not do more harm than good.

Dr. Santina concluded it was in the boys' best interests to terminate Mary's parental rights and permanently place John and James with the resource parents. Although the boys would be "sad" about the termination, she opined the security and stability provided by the resource parents, as well as their capacity to relate to the boys, would ameliorate any harm that might result. Dr. Santina believed that even if this placement were not to succeed, "it would be potentially harmful" for John to return to living with Mary.

Ilona Giordano testified for the Division as an expert in counseling. She began counseling James in December 2015. Giordano found the manner in which the resource parents managed James's issues on a day-to-day basis was significant, noting they calmed James and helped him through his issues. The

17

counseling appeared successful; by January 2017, James's incontinence resolved and he seemed happier.

After James's overnight visitations with Mary started in January 2017, he began to shut down in therapy and became more anxious, according to Giordano. In addition, his incontinence returned. He told Giordano he was nervous going on the visitations because of his older brothers and a lack of supervision. After the visitations ended, James became less withdrawn and more verbal. Giordano concluded James would thrive and succeed if he remained in the resource home.

Giordano began treating John in December 2017. He exhibited temper tantrums and emotional shutdowns. While he had difficulties engaging in therapy, Giordano testified John was slowly improving with each session.

Dr. Miller testified for the Division as an expert in clinical psychology. He first evaluated Mary in May 2016. Dr. Miller stated Mary appeared "inhibited, depressed, and exhausted" and exhibited "very little knowledge of the children" other than "superficial knowledge." She could tell Dr. Miller little of their friendships, favorite activities, and performance in school. Dr. Miller believed Mary, because of her childhood trauma involving her father's abusiveness and her mother's psychiatric problems, was unable to protect herself or her children from the abusive men with whom she partnered. He found Mary

presented symptoms of PTSD from the abuse she suffered from Carl, including significant sleep disturbance, hyperarousal, and avoidance. This resulted in Mary's pattern of dismissing or minimizing risks to the children.

Dr. Miller found Mary was unable to make her children's needs her primary concern. In addition, she was unable to cope with her stress and anxiety. As a result, Dr. Miller concluded her parental judgment was severely compromised and she was unable to provide a safe and stable parenting environment for her children. Dr. Miller concluded treatment for Mary's PTSD would take three to five years and require a commitment on her part.

Dr. Miller also evaluated Mary in October 2017. He found she was more exhausted, more depressed, and more inhibited emotionally than in the prior evaluation. She was working the night shift and only sleeping two to three hours during the day. She told him she was overwhelmed and tired all the time. She also stated she took anti-depressive medications, but stopped because she did not like the way they made her feel.

Dr. Miller found Mary's explanation for John and James's removal evasive and inconsistent. She could not provide him with a plan to address her PTSD and sleep problems if she was reunified with the boys. He found Mary "seemed to systematically reject any kind of help." He also found John and James's

A-3876-17T2

"resilience" would be undermined should they be returned to Mary's care, and they would suffer a "severe regression" and lose the progress they had made. He deemed Mary unable to address their special needs.

Dr. Miller conducted a bonding evaluation of Mary and the two boys. He said it was clear the boys loved her and there was a secure attachment but he failed to see the type of parenting behavior on Mary's part that would support them going forward.

Dr. Miller also conducted a bonding evaluation with the resource parents and found they appeared responsive to the boys' emotional needs and were collaborating with treatment providers. Dr. Miller found an emotional bond between James and the resource parents. The resource mother told him they were reticent about adopting John because of his violent history.

Dr. Miller concluded the boys would suffer no enduring harm from the termination of Mary's parental rights because the resource parents would be able to mediate the effects. He opined the "least detrimental outcome in this case" was for James and John to remain in the care of the resource parents. Dr. Miller thought there would be no short-term harm if John and James remained in contact with Mary while living with the resource parents.

A-3876-17T2

Dr. Miller believed John should not be returned to Mary's care even if the resource parents ultimately decided they could not adopt him. In that event, termination of Mary's parental rights would still not do more harm than good because Mary was a "risk factor" in John's life and because she did not have the energy or persistence to parent him effectively.

Psychiatric advanced registered nurse practitioner Rosemarie Marcus testified for the Division as an expert in field of psychiatry relating to psychiatric evaluations, psychotropic medication, and remediation. She stated John was placed on Risperdal for DMDD that manifested itself by his hitting and kicking other children at school and breaking things. He was subsequently placed on Zoloft for depression and anxiety. She stated his mood and behavior changed after a month on the medications. Marcus testified John had a "severe meltdown" in May 2017 when he learned he was not going to live with Mary, but his older brothers were. Over time he started to look forward to the possibility of reuniting with James in a resource home.

Dr. Reynolds testified on Mary's behalf as an expert in clinical psychology. He stated Mary and Carl had an abusive relationship that caused Mary's PTSD. Dr. Reynolds claimed John had a more aggressive behavior

pattern after he was removed from Mary's care. He described John and James as exhibiting some regressive behaviors in their overnight visitations with Mary.

Dr. Reynolds described Mary as cooperative during her evaluation. He did not find her to be tired or depressed. He found her to be informed about the children and motivated to parent them, but acknowledged she had a very limited peer support system.

Dr. Reynolds rejected Dr. Santina's conclusion that Mary was egocentric. He found Mary generally used appropriate parental strategies and skills when the children became unruly. His psychological testing did not reveal any clinical concerns. He concluded Mary would have benefitted from a more individualized approach to therapy. He described Mary's commitment to parenting as "unequivocal" but recognized she was likely to become overwhelmed when forced to deal with ordinary stress.

Based on his bonding evaluation between Mary and the children, Dr. Reynolds found the boys "internalized" Mary as their mother, she was very supporting and nurturing towards them, and they appeared to feel safe and secure with her. He also found the boys internalized each other as siblings, and viewed themselves as part of a family unit.

A-3876-17T2

Dr. Reynolds described the boys' bonding with the resource mother as "positive." In his view, the boys seemed to be doing very well in the resource home and exhibited a level of comfort and feelings of safety with her. He concluded the boys viewed the resource mother more as a trusted caregiver than a parental figure; yet found it "likely" the boys "would continue to develop a close relationship with her over time if they were to remain in that placement."

Dr. Reynolds concluded that if contact with Mary ended, the boys would suffer severe and enduring harm. On the other hand, regular and meaningful contact with Mary would mitigate that harm even if the boys remained in the resource home.

Dr. Reynolds blamed the boys' regressive behavior during the weekend visitations with Mary on anxiety and stress. He characterized Dr. Santina's description of Mary as socially and emotionally dependent as a personal judgment rather than a psychological opinion. Dr. Reynolds recognized it was "certainly possible" the boys "may regress" if they returned to living with Mary and their older brothers, yet believed the prognosis for successful reunification would be "quite high" if ongoing family therapy services remained in place.

23

Based on her review of the evidence, Judge Suh determined the Division proved all four prongs of the best interests standard by clear and convincing evidence.

With respect to prong one, the judge found Mary was emotionally neglectful towards the children "because her untreated mental condition negatively impacted her parenting capabilities. She lacked insight into the children's problems and did not recognize [John] and [James's] special needs. [John] and [James] experienced multiple layers of emotional vulnerability, and the emotional damage to them because of [Mary's] disengagement was palpable." The judge also cited Mary's failure to respond to requests from the Division and the schools regarding John: "When [Mary] finally consented to his prescribed medications, it was doubtful that she regularly dispensed it to him. When the school sent consent forms to [Mary], she did not respond. . . . As a result of [Mary's] inaction, [John's] medical needs were delayed." As to James, the judge found Mary's refusal to acknowledge or treat his anxiety-induced incontinence caused James significant emotional and physical harm.

As for prong two, the court found:

> Because of their special needs, [John] and [James] require a high level of parenting that [Mary] has not been able to provide. No doubt, [Mary] loves John and James. But their behavioral problems require a

> proactive parent who can provide stability and consistency, and ensure their safety. They need their medical and emotional needs met, a responsible adult to supervise them at night, and most importantly, a mother who can take care of her own mental health so she can take care of theirs.

The judge noted the children experienced housing instability while in Mary's care, including three instances of homelessness. They lived in a homeless shelter for several months, and were subject to threats of eviction due to non-payment of rent. In addition, Mary refused to cooperate with various social services agencies that offered to provide her with assistance to stave off eviction, including the Division, Family Promise, and Work First. The judge acknowledged Mary lived in the same residence since July 2016, thereby addressing the harm facing the children from the previous housing instability.

As for Mary's mental health, the judge noted Mary refused to participate in cognitive based therapy despite being diagnosed with PTSD, depression, anxiety disorder, and a personality disorder with narcissistic and dependent features. As a result, she "has not been able to cure, remediate, or treat . . . her mental illness." In addition, Mary denied the severity of her mental health issues. Therefore, she "has shown no ability or inclination to become a more responsible parent." The judge found Mary's refusal to treat her mental conditions negatively impacted her parenting capabilities, rendering her unable

25

to care for the children's special needs. While recognizing Mary's current employment and housing, the judge determined she had not "remediated the principal harm that led to [John and James's] removal." Therefore, "[d]espite the Division's efforts to assist" Mary, Judge Suh concluded "there was no evidence that a second attempt at reunification would succeed given her unyielding position."

As to the third prong, Judge Suh found the Division made reasonable efforts to help Mary correct the circumstances that led to the removal of the children. The judge noted the Division connected Mary with various service providers to both help avoid removal of the children and to facilitate potential reunification. Mary "failed to follow through with the requirements of the programs or failed to make herself available for the providers." Specifically, she "repeatedly failed to return phone calls, failed to appear for appointments, failed to answer the door when caseworkers or service providers arrived, and failed to respond to school personnel or to letters sent to the home by caseworkers." In addition, the Division paid for a motel and numerous services for the children. Judge Suh concluded "[t]he Division consistently endeavored to remove or ameliorate the circumstances that necessitated its intervention with [Mary]."

Judge Suh concluded the Division explored alternatives to termination of parental rights to no avail. The "relative resources" provided by Mary and the paternal grandmother did not wish to be considered and efforts to contact Carl were unsuccessful.

The judge also determined that termination of Mary's parental rights would do no more harm than good "if regular and continued contact" between James and Mary were maintained. Even though there was a "secure attachment and affectionate bond" between the children and Mary, James recognized that placement with his current resource parents offered him a stable, safe, and secure home. Unlike Mary, the resource mother was "fully knowledgeable about [James's] needs," and had the willingness and the ability to effectuate the treatment plan recommended for him. In the care of the resource parents, "[James] is able to function as a normal child, something he did not experience when he lived with [Mary]." The judge found Mary was not capable of providing the same structure at her home:

> To provide the same level of care, [Mary] would have to do more than love her children. She would have to engage fully in parenting, both physically and emotionally. To date, [Mary] has not shown that she is capable of this high level of engagement. She works nights and sleeps three hours when she returns home and tries to catch up with sleep on weekends. She is depleted when she walks in the front door. [Mary] has

A-3876-17T2

managed to provide shelter and food . . . for the children, but not much more. Because of their intense special needs, [John] and [James] need more than an adult who manages the household video game schedule.

As to John, the judge found there was an "emerging positive bond" with the resource parents. In addition, John expressed his wish to live with James and his behavior in the resource home "has remained stable." The judge also found John's prognosis for success with the resource family to be "guardedly positive." Judge Suh concluded:

> At the present time, the children's needs are being met. They are receiving medications and therapy that they desperately need. The children are cared for by resource parents who are empathetic, attuned to, and invested in both [John] and [James's] well-being. Dr. Santina opined, and this court accepts, that because of the lack of progress made by [Mary], it would be risky and potentially harmful to return [John] and [James] to their mother . . . . There is a very high risk that the children would regress emotionally and behaviorally in the care of [Mary]. The court concludes that with the promise of continued contact between [John] and [James] and [Mary] and their other brothers, severance of the legal bond between [John] and [James] and [Mary] would not do more harm than good.

Judge Suh entered a judgment terminating Mary's parental rights to John and James, and the children were placed in the guardianship and control of the Division. This appeal followed.

Mary does not challenge prongs one and three of the four-prong test for termination of parental rights.  Instead, she raises the following issues:

> I. THE TRIAL COURT ERRED IN ITS CONCLUSION THAT [MARY] WAS UNWILLING OR UNABLE TO ELIMINATE THE HARM FACING HER SONS, WHEN SHE PARTICIPATED IN MULTIPLE EVALUATIONS, OBTAINED STABLE AND SUITABLE HOUSING, MAINTAINED EMPLOYMENT, ATTENDED THE MAJORITY OF VISITATION, MAINTAINED A STRONG ATTACHMENT BOND, AND EVIDENCED UNDERSTANDING OF HER CHILDREN'S DISORDERS.
>
> II. THE TRIAL COURT ERRED IN ITS CONCLUSION THAT TERMINATION OF [MARY'S] PARENTAL RIGHTS WILL NOT DO MORE HARM THAN GOOD, WHEN HER SONS DEVELOPED AND MAINTAINED A STRONG ATTACHMENT BOND WITH THEIR MOTHER, WHICH IF SEVERED, WOULD CAUSE SEVERE AND ENDURING HARM, AND POSSIBLY RENDER JOHN A LEGAL ORPHAN.

"Appellate review of a trial court's decision to terminate parental rights is limited, and the trial court's factual findings 'should not be disturbed unless they are so wholly unsupportable as to result in a denial of justice.'"  In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002) (quoting J.T., 269 N.J. Super. at 188).  We give substantial deference to the family court judge's special expertise and opportunity to have observed the witnesses firsthand and evaluate

29

their credibility. N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 553 (2014). Even where a parent alleges "error in the trial judge's evaluation of the underlying facts and the implications to be drawn therefrom," deference must be afforded unless the judge "went so wide of the mark that a mistake must have been made." N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007) (first quoting J.T., 269 N.J. Super. at 189; then quoting C.B. Snyder Realty, Inc. v. BMW of N. Am. Inc., 233 N.J. Super. 65, 69 (App. Div. 1989)).

Guided by these standards, we conclude Judge Suh's factual findings are supported by substantial, credible evidence in the record, and her legal conclusions are sound.

As to the second prong, Mary contends she established she was able to alleviate the harm she posed to John and James by maintaining a job and an apartment throughout the trial. In addition, she claims she participated in numerous psychiatric and bonding evaluations and provided counseling for the boys. We are unpersuaded by these arguments. Substantial, credible evidence in the record supports the judge's conclusion Mary was unable to alleviate the psychological issues that posed a threat of harm to John and James.

As to the fourth prong, Mary contends termination of her parental rights would do John and James more harm than good based on the experts' conclusion

30

that they had a secure attachment and strong emotional bond with her. Mary also argues the Division failed to establish removal of the boys from the resource home would cause severe and enduring harm. In addition, she points to evidence that John lacked a strong emotional attachment with the resource parents, and the resource parents had not definitively decided they wanted to adopt him.

"The question ultimately is not whether a biological mother or father is a worthy parent, but whether a child's interest will be best served by completely terminating the child's relationship with that parent." N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 108 (2008). The fourth prong does not "require a showing that no harm will befall the child as a result of the severing of biological ties." K.H.O., 161 N.J. at 355. Rather, the issue "is whether, after considering and balancing the two relationships, the child will suffer a greater harm from the termination of ties with her natural parents than from the permanent disruption of her relationship with her foster parents." Ibid. That decision "necessarily requires expert inquiry specifically directed to the strength of each relationship." Ibid. (quoting J.C., 129 N.J. at 25). Relying on the expert opinions she found more convincing and persuasive, the judge concluded that, on balance, terminating Mary's parental rights would not cause more harm than good.

Mary points to the resource family's lack of definitiveness as to whether they will adopt John. "[T]erminating parental rights without any compensating benefit, such as adoption, may do great harm to a child." E.P., 196 N.J. at 109. The permanency plan calls for the resource parents to adopt John, and the resource mother testified that was her goal. In the event they decide not to adopt, Mary may file a motion for relief from judgment under Rule 4:50-1(e) based on changed circumstances. J.N.H., 172 N.J. at 472-74. In determining such a motion, the primary issue is "what effect the grant of the motion would have on the child." Id. at 475. See also N.J. Div. of Youth & Family Servs. v. T.S., 417 N.J. Super. 228, 249-50 (App. Div. 2010) (trial court directed to reexamine record based on post-trial changes in the evidence as to prong four). Therefore, any uncertainty as to John's adoption status did not prevent the Division from satisfying prong four.

"It is not our place to second-guess or substitute our judgment for that of the family court, provided that the record contains substantial and credible evidence to support the decision to terminate parental rights." N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448-49 (2012) (citing N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007)). "In a termination of parental rights trial, the evidence often takes the form of expert testimony by

psychiatrists, psychologists, and other mental health professionals." R.L.M., 236 N.J. at 146 (citing Lassiter v. Dep't of Soc. Servs., 452 U.S. 18, 30 (1981)). "[W]e rely on the trial court's acceptance of the credibility of the expert's testimony and the court's fact-findings based thereon, noting the trial court is better positioned to evaluate the witness' credibility, qualifications, and the weight to be accorded to [his or] her testimony." In re Guardianship of D.M.H., 161 N.J. 365, 382 (1999) (citing Bonnco Petrol, Inc. v. Epstein, 115 N.J. 599, 607 (1989)).

Judge Suh reviewed the evidence presented at trial, made detailed findings as to each prong of N.J.S.A. 30:4C-15.1(a), and concluded the Division met, by clear and convincing evidence, all of the legal requirements for a judgment of guardianship. Those findings and conclusions are supported by substantial, credible evidence in the record. Contrary to Mary's assertions, the judge's analysis of the facts tracks the statutory requirements of N.J.S.A. 30:4C-15.1(a), and comports with applicable case law. See, e.g., F.M., 211 N.J. at 447-54; E.P., 196 N.J. at 103-07. We discern no basis to disturb her ruling.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3876-17T2