# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0853-18T2

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

N.W.,

     Defendant-Appellant,

and

S.M.,

     Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF L.W.-M.
and M.W.,

     Minors.

_____

Submitted May 29, 2019 – Decided June 25, 2019

Before Judges Suter and Geiger.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Bergen County, Docket No. FG-02-0036-18.

Joseph E. Krakora, Public Defender, attorney for appellant (Robyn A. Veasey, Deputy Public Defender, of counsel; Christine Olexa Saginor, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Jason Wade Rockwell, Assistant Attorney General, of counsel; Natasha C. Fitzsimmons, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors (Toya Davis, Designated Counsel, on the brief).

PER CURIAM

Defendant N.W. appeals from the judgment of guardianship terminating her parental rights to her children, L.W.-M. (Liam) and M.W. (Maddie).[1] The children's Law Guardian and the Division of Child Protection and Permanency (the Division) urge us to affirm. Our review of the record shows the factual findings of the trial judge are supported by substantial credible evidence, including his evaluation of witness credibility, and based on those findings, his legal conclusions are correct. We therefore affirm the judgment of guardianship.

---

[1] We use initials and pseudonyms to protect the privacy of the parents and the children.

## I.

N.W. is the mother of two children. Liam was born in May 2016 and Maddie was born in December 2017. Defendant S.M. is the biological father of both children. N.W. and S.M. have never been married.

The Division first became involved with N.W. and S.M. upon receiving a referral raising concerns for Liam, then two months old. Police responded to N.W.'s residence due to an alleged domestic dispute between N.W. and S.M. The responding officers observed a hypodermic syringe sticking out of N.W.'s pocket. N.W. admitted to using heroin and cocaine. N.W. was arrested and charged with illegal possession of the syringe for use with a controlled dangerous substance (CDS).

The following month, police responded to another domestic dispute between N.W. and S.M. Officers observed an old contusion under N.W.'s eye. Both N.W. and S.M. told the officers the contusion was caused by a kitchen cabinet door and not by physical violence. Two days later, the Division implemented a safety protection plan (SPP) that prohibited S.M. from entering Liam's residence. Several days later, N.W. tested positive for oxycodone and oxymorphone.

A-0853-18T2

The following week, N.W. applied for a domestic violence temporary restraining order (TRO) against S.M. based on alleged harassment. S.M. informed police that N.W. attempted to run him over with her car. When police investigated, S.M. showed officers drug paraphernalia he claimed belonged to N.W. S.M. agreed to leave the residence. Two days later, police responded to another domestic dispute between N.W. and S.M., during which N.W. sustained a contusion on her forehead. S.M. showed the police a video of N.W. under the influence of narcotics. S.M. was arrested for assault and N.W. obtained a TRO against S.M. Based on this conduct, the Division substantiated allegations of abuse and neglect.

The following day, N.W. was referred by the Division to New Hope Foundation (New Hope) to attend a medically monitored inpatient substance abuse treatment program based on her Severe Opioid Use Disorder and Moderate Anxiolytic Use Disorder. Upon admission to New Hope, N.W. tested positive for oxycodone, buprenorphine, alprazolam, norbuprenorphine, and oxymorphone.

The Division implemented a revised SPP that required N.W. to be supervised during parenting time with Liam. The Division was awarded care and supervision of Liam. The trial court ordered N.W. to submit to random

urine screens and participate in all treatment programs recommended by the Division.

N.W. was granted a final restraining order (FRO) against S.M. as a result of the August 16, 2016 domestic violence incident. Two days later, N.W. was evaluated by a psychiatrist and admitted to using "roxies" two weeks earlier.[2] The psychiatrist recommended N.W. undergo detoxification. The following week, N.W. tested positive for benzodiazepines, oxycodone, oxazepam, and oxymorphone.

On September 15, 2016, the trial court ordered the care, custody, and supervision of Liam was to remain with the Division, and placed Liam with his maternal grandmother due to the ongoing risk to his life, safety, or health. The court found Liam's continued residence with N.W. would be contrary to his welfare because N.W. required inpatient substance abuse treatment. The court allowed N.W. parenting time supervised by the maternal grandmother or the Division. The court also ordered N.W. to undergo a psychological evaluation and substance abuse treatment, and to submit to random hair, drug, and alcohol screenings.

---

[2] "Roxy" is slang for Roxicodone, an instant release form of oxycodone. drugs.com/answers/what-is-a-roxy-306907.html (last visited June 14, 2019).

A-0853-18T2

On October 12, 2016, N.W. was arrested and charged with prowling to obtain CDS and failure to turn over CDS to police. She was placed on a conditional discharge for one year and fined. She failed to appear at a case management review conference the next day, despite receiving notice. The Division stated its intention to proceed with a Title 30 proceeding.

On October 31, 2016, N.W. was admitted into an inpatient treatment program at New Hope. N.W. did not attend a compliance review hearing four days later. The trial court determined the care, custody, and supervision of Liam would remain with the Division due to N.W.'s severe substance abuse issues and inpatient treatment. N.W. was successfully discharged from New Hope on November 14, 2016, and began residing with her grandmother in Brick. Three days later, Division workers met with N.W. and explained the services she needed to attend to reunite with Liam.

From November 18, 2016 to January 27, 2017, the Division could not locate N.W. At a February 2, 2017 compliance review hearing, N.W. was ordered to meet with a domestic violence liaison and undergo an update evaluation. The same day, N.W. was referred to the New Focus Program to attend an intensive outpatient substance abuse program based on her severe opioid and sedative use disorders, which were in early remission.

A-0853-18T2

The Division substantiated that, only six days later, N.W. continued to abuse opiates and watched Liam unsupervised. Investigation also revealed the maternal grandmother's paramour resided in the home contrary to court orders. This led to the Division removing Liam from the maternal grandmother's home and placing him in an unrelated resource home. Several days later, Liam was placed in the care of his paternal grandmother. The next day, N.W. was arrested for unpaid parking fines and spent two days in jail.

On February 24, 2017, N.W. was terminated from her domestic violence counseling services for non-compliance and failure to attend. N.W. was also terminated from the New Focus substance abuse treatment program for non-compliance and failure to attend. N.W. subsequently requested dismissal of the FRO entered against S.M. The Division learned N.W. was residing with S.M. at her uncle's residence.

Despite court orders requiring her to submit urine samples, N.W. refused to do so on May 3 and May 10, 2017. At a subsequent compliance review hearing, the court reminded N.W. that refusal to submit to random drug screens would result in the court drawing a negative inference. Despite that warning, N.W. refused to submit urine samples eight more times from May to July 2017. She also failed to attend a scheduled substance abuse evaluation.

In addition, N.W. did not visit Liam between May 26 and June 22, 2017, despite weekly scheduled visits.

On June 13, 2017, N.W. was terminated from the Center for Evaluation and Counseling program for failing to attend appointments and non-compliance. She also failed to attend a compliance review hearing on August 10, 2017. The trial court drew negative inferences against N.W. for her repeated failure to provide drug screen samples. The court also issued a permanency order accepting the Division's plan for termination of parental rights.

On September 7, 2017, N.W. overdosed on heroin but was revived by S.M. Thirteen days later, the Division filed a complaint for guardianship of Liam, citing N.W.'s ongoing substance abuse, history of unstable housing, lack of employment, and failure to remediate the issues leading to Liam's removal. Despite receiving notice, N.W. failed to attend the October 11, 2017 court hearing. The trial court kept all previously ordered requirements in place. On November 8, 2017, N.W. again failed to appear for court despite receiving notice.

On December 5, 2017, the Division learned N.W. was thirty-eight weeks pregnant and tested positive for opiates and benzodiazepines at a hospital. She

admitted to hospital staff that she used fifteen to twenty bags of heroin two days prior and illegally obtained Suboxone the day before. N.W. also disclosed she snorted six Xanax and Percocet pills per day, and used heroin continuously during at least the last six months of her pregnancy. At the time, N.W. was homeless.

After attempting to leave the hospital to smoke a cigarette and becoming combative with staff the following day, N.W. was placed on one-to-one watch. Later that evening, she gave birth to Maddie, who was immediately admitted to the Neonatal Intensive Care Unit for respiratory distress and narcotic withdrawal. N.W. was scheduled to undergo detoxification prior to her release from the hospital.

Two days after her birth, the Division learned Maddie developed uncontrolled withdrawal symptoms and also tested positive for benzodiazepines. Maddie displayed irritability, tremors, difficulty feeding, and weight loss. Three days later, N.W. threatened to overdose. Maddie was ultimately discharged from the hospital eight days after her birth. The Division then filed an amended guardianship complaint to include Maddie.

On December 24, 2017, N.W. began an inpatient program at Sunrise Substance Abuse Treatment Center (Sunrise House). N.W. completed the

Sunrise House thirty-day inpatient program on January 23, 2018. The program included attending individual, group, and family sessions. She was referred to Spring House, a halfway house facility for women, for follow-up care. She entered Spring House the same day.

After N.W. did not appear at the January 10 or February 7, 2018 hearings, the court reiterated its prior orders that N.W. attend scheduled psychological and bonding evaluations. An April 2018 Spring House progress report noted N.W. continued to participate in individual counseling sessions and therapeutic groups. She also began attending a twelve-week parenting class. The report also noted behavioral infractions, lack of emotional regulation, and anger management issues.

On April 27, 2018, N.W. underwent a psychological evaluation by Frank Dyer, Ph.D. In his written report, Dr. Dyer noted N.W. was prescribed Remeron, Trileptal, and BuSpar. N.W. also reported taking Neurontin for anxiety and restless leg syndrome. Dr. Dyer stated the most significant factor affecting N.W.'s parenting capacity was her "severe dependence on drugs, primarily opiate medications and heroin." He also noted her use "at various times" of "codeine, Xanax, cocaine, and mushrooms, as well as LSD and MDMA."

A-0853-18T2

N.W. related her extremely dysfunctional relationship with S.M. to their joint drug use and her dependence on him to procure drugs for her. She expressed a preference to being homeless with S.M. over living with her aunt and uncle, who provided her with a place to live. Dr. Dyer reported N.W. "was unable to state when she would be sufficiently prepared to undertake the task of parenting her children independently." She admitted her "extremely severe problem with substances." She also acknowledged a moderate problem with alcohol.

Dr. Dyer opined N.W. "has a significant antisocial aspect to her personality, and her interpersonal relationships are highly conflicted and abrasive. She displays a moderate tendency towards self-harm." Testing indicated "she suffers from posttraumatic symptoms and depression." She also "suffers from anxiety and presents with a degree of emotional instability." Dr. Dyer's overall diagnostic impression was N.W. suffered from: Opiate Dependence, in early remission; Depressive Disorder, not otherwise specified (NOS); Anxiety Disorder, NOS; rule out PTSD; and Personality Disorder, NOS with Antisocial and Dependent Features. Dr. Dyer stated N.W. had "just begun to address her drug abuse in a serious manner" and "it does not appear that she has yet done any real work on achieving a resolution of clinical

A-0853-18T2

problems." He noted N.W. "appears to depend heavily on the children's paternal grandmother as a substitute caretaker for them."

Dr. Dyer opined:

> Based on the case history and on the severity of [N.W.'s] drug addiction, emotional problems, and extremely dysfunctional relationship problems . . . she is quite far from having achieved the level of stability that would inspire confidence in her capacity to care for her two children without significant risk of harm. Additionally placing the children in [N.W.'s] care could conceivably increase the likelihood of her becoming involved [with S.M.] once again, which appears to be a significant trigger for her drug abuse, given their codependent history together.

Dr. Dyer further opined:

> I do assess [N.W.'s] prognosis for eventually overcoming her addiction as fair; however, this would necessarily entail continuation of her individual psychotherapy, appropriate medication management, involvement in Narcotics Anonymous, and developing the capacity to avoid legal problems and to avoid inappropriate romantic partners. In regard to permanency for [Maddie and Liam], I recommend that DCPP not consider [N.W.] as a viable candidate for custody of them.

On June 6, 2018, Spring House reported N.W. was making noticeable progress in her treatment and had not committed any recent behavioral infractions. She continued to participate in group sessions and was actively addressing her therapeutic issues.

12

The two-day guardianship trial took place in June 2018. Division worker Kimberly Norman and Dr. Dyer testified on behalf of the Division. N.W. testified on her own behalf. The trial court accepted S.M.'s voluntary surrender of his parental rights to Liam and Maddie.

Norman testified N.W. was still residing at Spring House, where she had been for the past five months, and had not been given a discharge date. Norman stated N.W. had no concrete plan for reunification including where she intended to live, employment prospects, or where the children would attend school.

Norman stated the children were doing very well under the care of their paternal grandmother, who was prepared to adopt them. All of their needs were met and Liam appeared very happy. The paternal grandmother frequently took the children to visit N.W.; she believed that would continue if N.W. remained sober. Norman opined it was in the children's best interest to terminate N.W.'s parental rights to achieve permanency for the children through adoption by their paternal grandmother, who provides a safe and stable environment for them.

The trial court found Norman's testimony credible, reasonable, and consistent with the exhibits. It noted Norman testified in a calm, direct, and

candid manner. She answered questions without hesitation and maintained eye contact with the examiners. Her testimony was based on her personal knowledge and her thorough review of the Division's files.

The parties stipulated to Dr. Dyer's qualifications as an expert in the field of psychology. Consistent with his report, Dr. Dyer voiced concerns about N.W.'s risk of relapse after discharge from Spring House. He opined there was a strong risk N.W. would start using drugs again given her extensive substance abuse problems and prior failed attempts at remaining sober when not in a controlled environment. He noted the stresses of securing housing, maintaining employment, and raising a toddler and an infant. He opined N.W. would have a high risk of relapse without the structure, supervision, and group support of the halfway house.

Dr. Dyer's remaining testimony was also consistent with his report. He noted N.W.'s personality disorder affected her ability to abide by certain restrictions imposed on her. He opined N.W. was "quite far away from making an actual start" of addressing her psychological issues.

Dr. Dyer also testified regarding the "tremendous risk" for future "adverse psychological consequences" in "[c]hildren who are exposed to domestic violence." He described the differing serious impacts suffered by

14

boys and girls exposed to domestic violence. Although Dr. Dyer noted Liam's positive connection to N.W., he distinguished "attachment" from mere positive connection, describing attachment as occurring where the child can confidently rely on their caregiver for protection, nurturance, and structure. He concluded neither child is securely attached to N.W.

In stark contrast, Dr. Dyer testified both children were securely attached to their paternal grandmother. He described Liam as focused, happy, and enthusiastic when under the care of his paternal grandmother. He opined that under the circumstances, including placement with the paternal grandmother for approximately one year, and N.W.'s limited contact with the children during that period, "it is very highly likely that the paternal grandmother . . . is [Liam's] central parental love object and attachment figure." He testified there is some possibility that if Liam were removed from his paternal grandmother he would suffer negative consequences in the form of low self-esteem, lack of basic trust, and the incapacity to attach to a new caregiver. If Liam were transferred to N.W.'s custody and she became overwhelmed, involved in a dysfunctional romantic relationship, or unavailable due to depression or substance abuse, disruption of the attachment to his parental grandmother would have serious long-term effects. He further opined Maddie would

15

likewise suffer if removed after gaining the ability to attach to the parental grandmother. Dr. Dyer believed it was in the best interests of the children to remain under the care of their parental grandmother.

On cross-examination, Dr. Dyer acknowledged N.W. was receiving services at Spring House and reportedly doing well in that environment. He noted, however, Spring House is a very structured program that closely monitors residents. Dr. Dyer expressed reservations about N.W.'s ability to remain sober after leaving the halfway house and living in an environment where she would be free to meet with people of her choosing and burdened by employment and child care responsibilities. His concerns took into account N.W.'s long and consistent drug use and relapse after inpatient treatment.

Dr. Dyer also considered the fact N.W. had only been sober since January 2018 and had not previously remained sober for any sustained period except while in a controlled environment at an inpatient facility or halfway house. He noted N.W. had used drugs consistently since she was fifteen years old. Dr. Dyer concluded there was significant potential for relapse. Dr. Dyer opined N.W. would have to be sober for two to three years before she could be entrusted to care for her children. He explained recovery is longer for long-term addicts.

16

The trial court found Dr. Dyer's testimony credible, believable, and reasonable in light of the other evidence, including the exhibits, court records, and the testimony of the other witnesses. The court noted Dr. Dyer testified in a calm and direct manner, was not evasive, and answered questions without hesitation. He maintained direct eye contact with examiners. The court found his testimony was consistent with the other evidence and testimony.

N.W. testified she loved her children and was determined to care for them in a safe and secure manner. Although she did not fully engage in the services previously offered by the Division, she said she was now fully engaged in all recommended services. She expressed an intention to complete her substance abuse treatment program and participate in an aftercare program, including a Mommy and Me program. She also planned to secure employment and safe housing. She stated Spring House would allow her to reside there until those goals were met and would continue to provide support even after she completed its program.

N.W. testified her abuse of prescription drugs evolved into using heroin following Liam's removal in September 2016. She admitted she did not receive prenatal care and continued to use heroin and overdosed while pregnant with Maddie. She knew caring for a toddler and an infant could be

stressful but was willing to accept the challenge. She understood her children were removed because of her drug use and she could not care for her children if she continued using drugs. N.W. recognized she was accountable for her past behavior and that remaining drug free is a day-to-day process. She claimed she was now a different person. On cross-examination, however, N.W. acknowledged she relapsed in the past after inpatient treatment and follow-up care, including using heroin after relapsing in March 2017.

N.W. also acknowledged she did not keep in contact with the Division and wanted to avoid it. She conceded she had not lived independently or soberly for a sustained period except while residing at an inpatient treatment facility or a halfway house. N.W. agreed Spring House was very structured. She was closely monitored, drug tested, and escorted when she left the premises.

N.W. further acknowledged Liam was in the Division's care and custody since August 2016. She understood her children need permanence and structure. She recognized she led an unstable life until January 2018, including periods when she was unemployed and homeless.

The trial court found N.W. credible, but considered her biased due to her desire to be reunited with her children. The court found N.W. was candid as to

her drug use, homelessness, and the fact she harmed Maddie by using drugs while she was pregnant. The court found N.W. sincere in her testimony of her commitment to remain drug free.

The trial court afforded the parties the opportunity to submit proposed findings of fact and conclusions of law. N.W. argued termination of her parental rights was not in the best interest of her children given the positive progress she made in her substance abuse treatment and her commitment to caring for her children. She contended the children's best interests would be served by referring her to a Mommy and Me program, thereby affording time to resolve any remaining substance abuse issues. The Law Guardian joined in the Division's position that termination was appropriate and any further delay in the permanent placement of Liam and Maddie would only exacerbate the harm.

On October 5, 2018, the trial court issued its decision terminating N.W.'s parental rights to Liam and Maddie. The trial court concluded the Division proved all four prongs of N.J.S.A. 30:4C-15.1(a) by clear and convincing evidence. This appeal followed. N.W. raises the following arguments:

> THE TRIAL COURT INCORRECTLY APPLIED
> THE LEGAL PRINCIPLES GOVERNING
> TERMINATION OF PARENTAL RIGHTS
> MATTERS TO THE FACTS. THE RECORD DOES

NOT SUPPORT THOSE VERY PRECISE STANDARDS AND THEREFORE TERMINATION OF N.W.'S RIGHTS SHOULD BE REVERSED.

 I. THE TRIAL COURT ERRED IN CONCLUDING THAT N.W. HARMED HER CHILDREN BY FAILING TO REMEDIATE HER PERCEIVED PARENTING DEFICITS IN A TIMELY MANNER.

 II. THE TRIAL COURT ERRED IN CONCLUDING THAT N.W. WAS UNWILLING OR UNABLE TO ELIMINATE ANY PERCEIVED HARM TO HER CHILDREN WITHIN THE REQUIRE[D] TIME CONSTRAINTS.

 III. THE TRIAL COURT ERRED IN CONCLUDING [THE DIVISION] MET ITS LEGAL OBLIGATION TO MAKE REASONABLE EFFORTS TO PROVIDE N.W. WITH SERVICES AND TO STRIVE TO OVERCOME BARRIERS TO HER PARTICIPATION IN THOSE SERVICES.

 IV. THE TRIAL COURT ERRED IN CONCLUDING THAT TERMINATION OF N.W.'S PARENTAL RIGHTS IS IN THE CHILDREN'S BEST INTERESTS.

## II.

We exercise limited review of a decision terminating parental rights. N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 552 (2014). In such cases, we will generally uphold the trial court's findings, so long as they are supported

by "adequate, substantial, and credible evidence." Ibid. (citing N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 108 (2008)). We give substantial deference to the family court judge's special expertise and opportunity to observe the witnesses firsthand and evaluate their credibility. Id. at 552-53. Thus, a termination decision should only be reversed or altered on appeal if the trial court's findings were "so wholly unsupportable as to result in a denial of justice." N.J. Div. of Youth & Family Servs. v. P.P., 180 N.J. 494, 511 (2004) (quoting In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)). Even where a parent alleges "error in the trial judge's evaluation of the underlying facts and the implications to be drawn therefrom," N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007) (quoting In re Guardianship of J.T., 269 N.J. Super. 172, 189 (App. Div. 1993)), deference must be afforded unless the judge "went so wide of the mark that a mistake must have been made." Ibid. (quoting C.B. Snyder Realty, Inc. v. BMW of N. Am. Inc., 233 N.J. Super. 65, 69 (App. Div. 1989)). However, we accord no special deference to the Family judge's interpretation of the law and the legal consequences that flow from established facts. N.J. Div. of Youth & Family Servs. v. I.S., 202 N.J. 145, 183 (2010).

N.W. argues the Division failed to establish the required elements to succeed in a termination proceeding.  To obtain termination of parental rights, the Division must satisfy all four prongs of the following test:

> (1)  The child's safety, health or development has been or will continue to be endangered by the parental relationship;
>
> (2)  The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;
>
> (3)  The Division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4)  Termination of parental rights will not do more harm than good.
>
> [N.J.S.A. 30:4C-15.1(a).]

The four prongs of the best interests standard "are not discrete and separate; they relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests."  N.J. Div. of Child Prot. & Permanency v. R.L.M., 236 N.J. 123, 145 (2018) (quoting In re Guardianship of

K.H.O., 161 N.J. 337, 348 (1999)).  Each prong is "extremely fact sensitive and require[s] particularized evidence" addressing "the specific circumstances in the given case."  R.G., 217 N.J. at 554 (quoting M.M., 189 N.J. at 281).  The Division must prove all four prongs by clear and convincing evidence.  Ibid.

The first prong of the best interest test requires the judge to determine whether "the child's safety, health, or development has been or will continue to be endangered by the parental relationship."  N.J.S.A. 30:4C-15.1(a).  "Harm, in this context, involves the endangerment of the child's health and development resulting from the parental relationship."  P.P., 180 N.J. at 506 (quoting K.H.O., 161 N.J. at 348).  The analysis does not "concentrate on a single or isolated harm or past harm," but rather focuses on "the effect of harms" arising over time.  K.H.O., 161 N.J. at 348.  Of concern is both actual harm to the children and the risk of future harm.  See In re Guardianship of DMH, 161 N.J. 365, 383 (1999) ("Courts need not wait to act until a child is actually irreparably impaired by parental inattention or neglect.").  Further, the harm need not be physical; emotional or psychological harm may suffice.  In re Guardianship of K.L.F., 129 N.J. 32, 43-44 (1992) (citing In re Guardianship of J.C., 129 N.J. 1, 18 (1992)).

Maddie was clearly harmed by N.W.'s heroin addiction.  As recognized by the Court in K.H.O.:

> [A] child born addicted to drugs and suffering from the symptoms of drug withdrawal as a result of her mother's substance abuse during pregnancy has been harmed by her mother and that harm endangers the child's health and development. That determination satisfies the first prong of the best interest standard.
>
> [161 N.J. at 349 (citing N.J.S.A. 30:4C-15.1(a)(1)).]

The trial court found N.W. endangered the health, safety, and development of her children and was not presently able to safely care for them. Since the Division became involved, N.W. has been arrested and jailed, overdosed on drugs while pregnant, remained in a toxic relationship with S.M., been homeless for extended periods, remained unemployed, missed numerous treatment appointments, avoided contact with the Division, violated the SPP, and relapsed after completing an inpatient treatment program. Maddie was born addicted to heroin.

The evidence also demonstrates the potential for future harm. Although N.W. made progress by achieving sobriety at Spring House, discharge from that program will not occur until she secures employment and suitable housing. N.W. never lived independently and soberly for a significant period prior to enrolling in Spring House. Placing the children in N.W's care would create the risk of the children being removed a second time due to the stress of living independently, working, and caring for two young children, which

A-0853-18T2

creates the potential for relapse, inability to maintain a safe and stable residence, resumption of her relationship with S.M., and other behaviors associated with her antisocial tendencies. The record contains substantial support for the trial court's conclusion the Division satisfied prong one.

"The second prong of the statutory standard relates to parental unfitness." K.H.O., 161 N.J. at 352. It "is aimed at 'determining whether the parent has cured and overcome the initial harm that endangered the health, safety, or welfare of the child, and is able to continue a parental relationship without recurrent harm to the child.'" N.J. Div. of Youth & Family Servs. v. F.H., 389 N.J. Super. 576, 617 (App. Div. 2007) (quoting K.H.O., 161 N.J. at 348). As noted in K.H.O.:

> Because a child born drug addicted and suffering from withdrawal symptoms has been endangered, and because in many cases the parent herself cannot help in her child's care or cure, the second element of the best interests standard must focus on the measures taken by the parent after the child's birth to maintain the parent-child relationship and to foster an environment leading to normal child development. . . . Thus, the second prong may be met by indications of parental dereliction and irresponsibility, such as the parent's continued or recurrent drug abuse, the inability to provide a stable and protective home, the withholding of parental attention and care, and the diversion of family resources in order to support a drug habit, with the resultant neglect and lack of nurture for the child.

25

[161 N.J. at 352-53.]

Ultimately, "parental fitness is the key to determining the best interests of the child." Id. at 348 (citing In re Adoption of Children by L.A.S., 134 N.J. 127, 139 (1993)). The Division may satisfy this prong by demonstrating the parent's inability or unwillingness to resolve issues that are detrimental to the child. N.J. Div. of Youth & Family Servs. v. B.G.S., 291 N.J. Super. 582, 592 (App. Div. 1996).

Although N.W.'s argument directs our attention to the qualifications of Dr. Dyer, we construe it as an attack on the trial court's finding that the Division satisfied the second prong of the analysis as it relates to N.W.'s ability to overcome the initial harm that endangered the children and prevent its reoccurrence. N.W. stipulated to Dr. Dyer's qualifications as an expert in psychology. She nevertheless attacks the reliability of Dr. Dyer's opinion regarding her potential for relapse. She asserts he lacks professional expertise with respect to the intersection of addiction and mental illness and is unfamiliar with the American Society of Addiction Medicine. We are unpersuaded by this argument.

"[O]pioid dependence is a chronic relapsing disorder" with no known cure. Jacinta O'Shea and Jan Melichar, Opioid Dependence, Nat'l Insts. of

26                                                                    A-0853-18T2

Health, www.ncbi.nlm.nih.gov/pmc/articles/PMC2907824/ (last visited June 14, 2019). "[R]elapse is a predictable part of recovery" that "must be addressed." Manual for Operation of Adult Drug Courts in New Jersey, at 43 (July 2002), available at https://njcourts.gov/courts/assets/criminal/dctman.pdf. (Drug Court Manual). Those suffering from substance abuse often "experience relapse, and 'repeated treatments become necessary to increase the intervals between and diminish' the severity of relapses until abstinence is achieved." Ellen M. Weber, Bridging the Barriers: Pub. Health Strategies for Expanding Drug Treatment in Cmtys., 57 Rutgers L. Rev. 631, 639 (2005) (quoting Alan I. Leshner, Addiction is a Brain Disease, Issues in Sci. and Tech. 75, 76-77 (Spring 2001)). Indeed, Drug Court participants, who are subject to "intensive supervision, frequent drug testing, and regular court appearances, combined with treatment and recovery services," State v. Meyer, 192 N.J. 412, 429 (2007) (citing Drug Court Manual, at 3-4), commonly relapse despite the threat of immediate jail sanctions for a positive drug screen, Drug Court Manual, at 43. As a result, Phase III of the Drug Court program focuses upon relapse prevention. Id. at 40.

Opioid use disorder in remission in a controlled environment is a well-recognized concept and diagnosis. Diagnostic and Statistical Manual of Mental

A-0853-18T2

Disorders (5th ed. 2013) (ICD-9-CM code 304.00 (severe opioid use disorder in early remission in a controlled environment)). See also Int'l Classification of Diseases and Health Related Problems (ICD-10) (10th rev. 1994), Code F11.21. Relapse is common upon release from a controlled environment where access to opioids is restricted. For severe relapsing opioid dependence, long-term maintenance using an oral opioid agonist such as methadone or buprenorphine combined with ongoing counseling and support is preferred. The Merck Manual of Diagnosis and Therapy, 3246-47 (2nd ed. 2018).

As a licensed clinical psychologist, Dr. Dyer is qualified to diagnose N.W. with opioid dependence, in early remission. His conclusion that N.W. faces the risk of relapse after exiting a controlled environment is supported by substantial credible evidence in the record. The potential for relapse despite treatment and aftercare poses a palpable risk N.W. will be unable to overcome or remove the harm her addiction and relationship choices present. Her long term, severe abuse of drugs, beginning at age fifteen, which escalated to heroin addiction while pregnant, from which she is only in the early stages of recovery, makes it likely she will encounter difficulties remaining sober when not in a controlled environment. The record bespeaks that risk. N.W. previously relapsed after completing a twenty-eight-day inpatient program. The record reveals the harm

to the children is likely to continue if N.W. becomes their caretaker. That risk will continue into the foreseeable future. Thus, the trial court correctly determined the Division satisfied prong two.

To satisfy the third prong, the Division must prove it made "diligent efforts to reunite the family." K.H.O., 161 N.J. at 354. The analysis "contemplates efforts that focus on reunification of the parent with the child and assistance to the parent to correct and overcome those circumstances that necessitated the placement of the child into foster care." Ibid. "[T]he statutory definition of 'diligent efforts' is 'reasonable attempts by an agency authorized by the [D]ivision to assist the parents in remedying the circumstances and conditions that led to the placement of the child and in reinforcing the family structure.'" I.S., 202 N.J. at 176 (quoting DMH, 161 N.J. at 386).

N.W. contends the Division failed to refer her for treatment when funding for a program she was attending ran out in November 2017. The record shows otherwise. A Division worker promptly provided N.W. with the names of three other treatment facilities. Multiple attempts to follow-up from November 22, 2017 to January 23, 2018, were unsuccessful. N.W. refused to engage with the Division until January 27, 2018. In addition, N.W.'s persistent

failure to complete the services provided by the Division resulted in her termination from various programs.

The Division routinely offered services to N.W. to address her needs. By any measure, the Division made reasonable efforts to provide services to N.W. to correct the behaviors that led to removal. The record likewise demonstrates the Division considered alternatives to termination of parental rights, such as kinship legal guardianship, prior to determining termination was appropriate. Thus, the trial court correctly determined the Division satisfied prong three.

Lastly, the Division must demonstrate "that termination of parental rights will not do more harm than good to the child." K.H.O., 161 N.J. at 354-55 (citing N.J.S.A. 30:4C-15.1(a)(4)). However, the Division need not "show[] that no harm will befall the child as a result of the severing of biological ties." Id. at 355. Instead, the issue "is whether, after considering and balancing the two relationships, the child will suffer a greater harm from the termination of ties with her natural parents than from the permanent disruption of her relationship with her foster parents." Ibid. To satisfy this prong of the analysis, the Division must "offer testimony of a 'well-qualified expert who has had full opportunity to make a comprehensive, objective, and informed evaluation' of the child's

relationship with both the natural parents and the foster parents." N.J. Div. of Youth & Family Servs. v. A.R., 405 N.J. Super. 418, 442 (App. Div. 2009) (quoting M.M., 189 N.J. at 281).

Dr. Dyer determined Liam has a stronger attachment to his paternal grandmother than to N.W. and that the paternal grandmother is Liam's "central parental love object and attachment figure." Dr. Dyer found Maddie was too young to develop a specific attachment to either parent or the paternal grandmother. Those findings are unsurprising. Liam was removed from N.W.'s care when he was five months old. Maddie was less than a year old at trial. She was removed from N.W. a few days after birth and has never lived with her. Moreover, N.W.'s participation in supervised visits with her children was sporadic with many scheduled visits cancelled due to N.W.'s absence.

Dr. Dyer concluded Liam "would display a severe short-term reaction of the stress and disorientation" if "removed from his paternal grandmother and placed with a well-functioning caretaker." He would also "be placed at some risk of developing longer-term problems including impaired self-esteem, impaired basic trust, and an impaired capacity to attach." If he were "placed with a dysfunctional caretaker who suffered from conditions such as depression, personality problems, or drug abuse, then there would be a much

greater likelihood of longer-term negative effects due to severing him from his present attachment figure."

Dr. Dyer concluded the children are happy, secure, and enthusiastic with their paternal grandmother, who is "totally committed to the welfare of her grandchildren." They appear to be thriving in her care. Dr. Dyer recommended adoption of both children by the paternal grandmother. The record amply supports the determination that termination of N.W.'s parental rights will not do more harm than good. The trial court correctly determined the Division satisfied prong four.

Any issues raised but not otherwise addressed lack sufficient merit to warrant discussion in our opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0853-18T2